*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CF-1376

TRAVONN DAVIS, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2017-CF3-006133)

(Hon. Ronna L. Beck, Trial Judge)

(Argued January 18, 2022      Decided December 21, 2023)

*Paul R. Maneri*, Public Defender Service, with whom *Samia Fam*, *Jaclyn Frankfurt*, Public Defender Service, and *Dennis Martin*, Public Defender Service at the time, were on the brief, for appellant.

*Ethan L. Carroll*, Assistant United States Attorney, with whom *Michael R. Sherwin*, Acting United States Attorney at the time, and *Elizabeth Trosman*, *Suzanne Grealy Curt*, and *Brittany Keil*, Assistant United States Attorneys, were on the brief, for appellee.

Before EASTERLY and DEAHL, *Associate Judges*, and THOMPSON,[*] *Senior Judge*.

---

[*] Senior Judge Thompson was an Associate Judge of the court at the time of argument. On October 4, 2021, she was appointed as a Senior Judge but continued

Opinion for the court by *Associate Judge* Easterly.

Dissenting Opinion by *Senior Judge* Thompson at page 46.

EASTERLY, *Associate Judge*: Travonn Davis challenges the denial of his motion to suppress inculpating data from the GPS monitor he was required to wear by the Court Services and Offender Supervision Agency ("CSOSA") while he was on supervised release for a prior offense. Mr. Davis's motion to suppress was litigated in the trial court before this court issued its decision in *United States v. Jackson*, 214 A.3d 464 (D.C. 2019). In *Jackson,* this court recognized that (1) requiring an individual to be subject to GPS monitoring is a search under the Fourth Amendment, *id*. at 472, and (2) such a search of an individual on probation may be upheld as constitutional under the special needs doctrine, which allows reasonable regulations to substitute for the warrant and probable cause requirements of the Fourth Amendment where special needs exist, *id*. at 472-81 (citing *Griffin v. Wisconsin*, 483 U.S. 868 (1987)). But neither *Jackson* nor this court's subsequent decision in *Atchison v. United States*, 257 A.3d 524 (D.C. 2021) (extending the special needs rationale employed in *Jackson* to evaluate GPS monitoring of probationers to supervised releasees) considered if CSOSA's regulation authorizing electronic monitoring is lawful under the D.C. Code and therefore could be

---

to serve as an Associate Judge until February 17, 2022. *See* D.C. Code §§ 11-1502, 1504(b)(3). On February 18, 2022, she began her service as a Senior Judge. *See* D.C. Code § 11-1504.

considered a "reasonable" basis for these searches under a special needs analysis. In their briefs to this court, the parties address this issue: Mr. Davis asserts that CSOSA's imposition of a GPS monitor on Mr. Davis could not be upheld as a special needs search under *Jackson*, inter alia, because the regulation underlying this practice falls outside the agency's statutory authority; the government argues, inter alia, that CSOSA's regulation is lawful and thus a reasonable foundation for a special needs search.

Critically, CSOSA is not the only federal agency with statutory authority over D.C. supervised releasees. The United States Parole Commission has primary authority, and CSOSA carries out its responsibilities vis-à-vis supervised releasees "on behalf of" the Parole Commission, not as an independent actor. D.C. Code § 24-133(c)(1). Mirroring the system governing federal releasees, the United States Parole Commission has the same adjudicatory powers federal trial courts have to set or modify the conditions of release or revoke release—powers that include the authorization of warrantless searches—while CSOSA has the same powers that federal probation officers have to track compliance with these conditions of release. *See* D.C. Code § 24-133(c)(2) & (d). Although a different statutory provision gives the Director of CSOSA authority to "[d]evelop and operate intermediate sanctions . . . for sentenced offenders," D.C. Code § 24-133(b)(2)(F), based on the legislative history of the term "intermediate sanctions" and our understanding that

the Parole Commission's authority vis-à-vis supervised releasees tracks that of a federal district court, we do not understand that provision to give CSOSA the unilateral power to authorize searches—which the Supreme Court in recent years has held clearly encompasses GPS monitoring—of supervised releasees at its officers' discretion.

Considering CSOSA's bounded statutory authority, the procedural protections the Parole Commission otherwise affords against warrantless searches of people on supervised release, and our evolved understanding that electronic monitoring constitutes a search deserving of Fourth Amendment protection, we conclude that CSOSA's regulation authorizing its officers to discretionarily and unilaterally impose such monitoring, 28 C.F.R. § 810.3(b)(6), is unlawful to the extent it is applied to supervised releasees. Because the government can have no legitimate interest in the enforcement of an unlawful regulation, reliance on the regulation is perforce unreasonable under a special needs analysis. We therefore hold that Mr. Davis's motion to suppress the GPS data gathered by CSOSA should have been granted and his guilty plea conditioned on the denial of that motion must be vacated.

## I.    Facts and Procedural Background

In 2012, Mr. Davis was sentenced and incarcerated for armed robbery, and in 2013, he began a five-year period of supervised release in connection with that

incarceration. The conditions of his release, set by the Parole Commission, did not include GPS monitoring or searches of his person at CSOSA's discretion, nor was Mr. Davis required to comply with a curfew or house arrest. Apart from being a day late to report for an office visit in May 2016, it appears Mr. Davis was fully compliant with the conditions of his supervised release until he was arrested and charged with misdemeanor assault on a police officer ("APO") on June 29, 2016. Although no probable-cause finding in support of the arrest was made and no prosecution followed, his Community Supervision Officer ("CSO") from CSOSA placed Mr. Davis on GPS monitoring two weeks later as a "sanction" following this arrest. Under CSOSA regulations, an officer may unilaterally order such monitoring for "a specified" period of time. *See* 28 C.F.R. § 810.3(a) (2023)[1] (explaining a supervised releasee "will be in violation of the conditions of [their] supervision" and "administrative sanctions" may be imposed "if [their] CSO has reason to believe that [they] are failing to abide by the general or specific conditions of release or [they] are engaging in criminal activity"); 28 C.F.R. § 810.3(b)(6) (listing "electronic monitoring for a specified amount of time" as an administrative sanction "available to the CSO").

With the exception of a few weeks in August during which his GPS monitor was removed in relation to another arrest, Mr. Davis remained on GPS monitoring

---

[1] All subsequent references to the C.F.R. are to the 2023 version.

for the next three months until November 29, 2016, when his CSO discharged him from GPS monitoring twelve days after his misdemeanor APO charge was dismissed.

During the periods when Mr. Davis was required to be on GPS monitoring, he was forbidden from removing the GPS tracking device, required to charge the device for an hour twice every day (once in the morning and once in the evening), during which he had to remain awake and next to an electrical outlet, and prohibited from engaging in activities that would submerge the device in water (e.g., swimming or taking baths). Per CSOSA's documentation and the facts stipulated by the parties, all of Mr. Davis's movements during these periods were "monitored by CSOSA's (24/7) Monitoring Center" and "tracked and stored as an official record," which would be "indefinitely maintain[ed]" and accessible without a warrant by CSOSA and by the Metropolitan Police Department.

Meanwhile, on November 19, 2016, two days after the misdemeanor APO charge was dismissed but ten days before Mr. Davis's CSO discharged him from GPS monitoring, MPD responded to a report of an armed carjacking in southeast D.C. MPD subsequently searched the location records of all people on CSOSA GPS monitoring to identify those who were near the site at the time of the incident and thereby linked Mr. Davis to the time and place of the carjacking and to the area where MPD later recovered the car. Based on this connection, Mr. Davis was

indicted on a number of related charges in April 2017.

Mr. Davis moved to suppress the GPS data, asserting that its collection violated his Fourth Amendment rights.[2]  The government, which had the burden to defend the challenged warrantless search, *see infra* Part II.B., argued in response that (1) Mr. Davis had consented to the search (an argument it has since abandoned) and (2) the warrantless search of Mr. Davis was reasonable under a general totality-of-the-circumstances analysis (the same argument it made in Superior Court to oppose suppression in *United States v. Jackson*, No. 2015-CF3-2512, in which a challenge was raised to warrantless CSOSA GPS monitoring in the context of probation and which led to this court's decision in *Jackson*, 214 A.3d at 464).  The government did not invoke the special needs doctrine.  In fact, in its argument defending CSOSA's sharing of the GPS monitoring data, *see supra* note 2, the government expressly disclaimed reliance on the special needs doctrine.

At the suppression hearing, the trial court sua sponte requested supplemental briefing from the parties on "the authority of CSOSA to require GPS monitoring." The court explained that supervised release was different from probation, it had looked at the statutory framework, and it was aware that "the Parole Commission has the authority under our Code to exercise the authority of the [c]ourt" over

---

[2] Mr. Davis also challenged CSOSA's sharing of the GPS monitoring data with the police but he has not pursued that issue on appeal.

supervised releasees. But, the court observed, "CSOSA is the one here that . . . imposed the GPS monitoring." Referencing the operative statutes, the court asked whether CSOSA "can . . . just do that?" and if the government's position was that it could, whether that authority came from a statute or elsewhere. The court's "focus" was "what entitles CSOSA to impose the GPS monitoring condition?" In its supplemental opposition, the government renewed its constitutional defense of CSOSA's installation of the GPS monitor, arguing the imposition of GPS monitoring passed a general reasonableness analysis under the Fourth Amendment based on the totality of the circumstances, citing inter alia *United States v. Knights*, 534 U.S. 112 (2001), and *Samson v. California*, 547 U.S. 843 (2006). In response to the court's question about CSOSA's authority, the government acknowledged that the Parole Commission's authority over supervised releasees under D.C. Code § 24-133(c)(2) encompassed GPS monitoring, and then argued that, even though the Parole Commission had not ordered GPS monitoring for Mr. Davis, CSOSA was authorized "to impose it as an 'intermediate sanction' to encourage compliance with release conditions." As support for this assertion, the government cited this court's decision in *Hunt v. United States*, 109 A.3d 620, 621 (D.C. 2014) and D.C. Code § 24-133(b)(2)(F), as well as CSOSA's own regulations regarding administrative sanctions, 28 C.F.R. § 810.3. In his reply to the government's supplemental opposition, Mr. Davis countered that the *Knights* line of cases had no application;

although D.C. Code § 24-133 might give the *Parole Commission* authority to order GPS monitoring of a supervised release, CSOSA did not have "independent authority" do so; and to the extent its regulations purported to authorize such a sanction, they exceeded "the nature of an administrative sanction itself."

The trial court orally denied the motion to suppress at a subsequent hearing, relying exclusively on the government's totality-of-the-circumstances argument. The court concluded that, given the "diminished expectation of privacy" of people on supervised release and the government's "substantial" interest in enforcing compliance and deterring new offenses, CSOSA's actions were reasonable, such that no violation of the Fourth Amendment had occurred. Mr. Davis consequently entered a conditional plea of guilty on the charges of armed robbery and unlawful possession of a firearm, on stipulated facts and subject to his appeal of the denial of his suppression motion.

Mr. Davis timely appealed, and this court, on Mr. Davis's request, stayed briefing in his case for the resolution of the appeal in *Jackson*. Following the resolution of *Jackson* and this court's determination that CSOSA's warrantless GPS monitoring of a probationer could be upheld under the special needs doctrine, *see Jackson*, 214 A.3d at 467, the parties filed their briefs and addressed *Jackson*'s special needs analysis. After the parties filed their briefs but before the case was argued, this court decided *Atchison*, in which we extended the application of

*Jackson*'s special needs rationale to GPS monitoring of probationers to supervised releasees. 257 A.3d at 530.

## II.     Analysis

We focus on Mr. Davis's argument that the trial court erred in denying his motion to suppress the GPS data, because CSOSA's regulations permitting GPS monitoring exceeded the agency's legal authority, and, without lawful regulations, the government's GPS search cannot be deemed reasonable under the Fourth Amendment special needs doctrine. This presents a purely legal question, which we review de novo. *See Lewis v. United States*, 767 A.2d 219, 221 (D.C. 2001). We conclude the special needs test is not satisfied and decline the government's invitation to look beyond that test to a totality-of-the-circumstances analysis under *Knights* and *Samson*.

## A.     The Fourth Amendment, GPS Monitoring, the Special Needs Doctrine, and the Limits of Our Prior Decisions

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. In the last decade, the Supreme Court has issued several decisions making clear that the Fourth Amendment's protections extend to individuals subject to location monitoring by GPS tracking devices. Because the installation of a location monitor on someone without their consent necessarily involves a physical trespass onto their

person, the Supreme Court held that such an action is a "search" within the meaning of the Fourth Amendment. *Grady v. North Carolina*, 575 U.S. 306, 308-09 (2015). The Court also recognized that, beyond the initial physical intrusion of installation, GPS monitoring implicates critical privacy interests because it "generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about [their] familial, political, professional, religious, and sexual associations." *Riley v. California*, 573 U.S. 373, 396 (2014) (quoting *United States v. Jones*, 565 U.S. 400, 415 (2012) (Sotomayor, J., concurring)). And the Court recognized that "individuals have a reasonable expectation of privacy in the whole of their physical movements," demanding Fourth Amendment scrutiny of intrusions thereon. *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018); *see also Jones*, 565 U.S. at 413-18 (Sotomayor, J., concurring).

In the context of criminal investigations, searches undertaken without a judicial warrant based on probable cause are generally considered unreasonable. *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995). But there are several exceptions to this general probable cause requirement, including one for searches conducted to serve "special needs[] beyond the normal need for law enforcement . . . ." *Griffin v. Wisconsin*, 483 U.S. 868, 873-74 (1987) (internal quotations marks omitted). In *Griffin*, the Supreme Court held that the operation of a state probation system could be a "special need" because probationers as a class

have reduced liberty interests and because probation restrictions aim to promote rehabilitation and prevent harm to the community. *Id.* at 874-75. But the Court in *Griffin* cautioned that, although a "special need" like probation "permit[s] a degree of impingement upon privacy that would not be constitutional if applied to the public at large[,] [t]hat permissible degree is not unlimited." *Id.* at 875.

The key in *Griffin* was that the search in question "was carried out pursuant to a regulation that itself satisfies the Fourth Amendment's reasonableness requirement under well-established principles," such that the regulation effectively stands in for the warrant typically required. *Id.* at 873. To assess the reasonableness of a search-authorizing regulation, the court weighs the governmental interest served by the regulation (and how effectively the regulation serves that interest) against the intrusion on the liberty interests of the class of people subject to the regulation. *See, e.g.*, *Acton*, 515 U.S. at 654-64 (balancing the nature of the privacy interest, the character of the intrusion on that interest, the governmental concern at issue, and the efficacy of the means in question of addressing that governmental concern); *see also Chandler v. Miller*, 520 U.S. 305, 314 (1997) (explaining this is a "context-specific inquiry" in which the court "examin[es] closely the competing private and public interests advanced by the parties"). This test is now referred to as a "special needs" analysis. *See, e.g.*, *Jackson*, 214 A.3d at 475.

In *Jackson*, the government successfully appealed a trial court order suppressing GPS tracking data collected by CSOSA and acquired by the MPD on the grounds that the police search of this data "infringed Mr. Jackson's reasonable expectation of privacy." *Id.* at 467. This court first rejected the argument that CSOSA could not impose GPS monitoring without a court-issued warrant and held that "*Griffin*'s 'special needs' analysis applies to CSOSA's installation of a GPS device" to monitor the movements of people on probation. *Id.* at 471, 475. This court then concluded that, on the record before the court, Mr. Jackson had no reasonable expectation of privacy in the data CSOSA had collected that would preclude the agency from sharing this data with the police. *Id.* at 481-87. In *Atchison*, this court extended *Jackson*'s application of a special needs analysis to CSOSA's monitoring of probationers via GPS to people on supervised release. 257 A.3d at 530-31. But in both *Jackson* and *Atchison* this court assumed that a legitimately promulgated, valid regulation authorized CSOSA's search. *See Jackson*, 214 A.3d at 475-77 (explaining the regulation without assessing its validity); *Atchison*, 257 A.3d at 530-31 (relying on *Jackson*). More particularly, neither of these two decisions discuss the statutory role of the Parole Commission vis-à-vis sanctioning supervised releasees or subjecting them to warrantless searches. And while both *Jackson* and *Atchison* make passing reference to CSOSA's statutory authority, in neither case does it appear that the parties raised the agency's

search or sanction authority (or the limits thereof) to the court's attention and trained the "judicial mind" upon it.[3] *See District of Columbia v. Sierra Club*, 670 A.2d 354, 359-60 (D.C. 1996).

To the extent the government (or the dissent, *see Post* at 68-71) seeks to suggest that this court has already resolved the legitimacy of CSOSA's administrative sanctions regulations, we cannot agree. The government quotes *Jackson*, 214 A.3d at 476, quoting a portion of *Hunt*, 109 A.3d at 621, that described CSOSA's regulations, and then asserts that this court in *Jackson* and *Hunt*

---

[3] Because the legitimacy of CSOSA's authority under a special needs rationale was unexplored, *Jackson* leaves unanswered how CSOSA's regulation authorizing imposition of a GPS monitor on a probationer squares with D.C. Code § 16-710 (requiring that "[a] probationer . . . be provided by the clerk of the court with a written statement of the terms and conditions of his probation at the time when he is placed thereon" and "shall observe the rules prescribed for his conduct *by the court* and report to the probation officer as directed" (emphasis added)), D.C. Code § 24-133(c)(1) (directing CSOSA to carry out its supervisory responsibilities "*on behalf of the court* or agency having jurisdiction over the offender being supervised" (emphasis added)), D.C. Code § 24-133(d) (granting CSOSA officers only "the same powers and authority as are granted by law to United States Probation and Pretrial Officers"), Fed. R. Crim. P. 32.1 (addressing revoking or modifying probation and for the latter requiring a hearing wherein the probationer has a right to counsel), or this court's decision in *Barnes v. United States*, 513 A.2d 249, 251 (D.C. 1986) (holding that because "an order adversely modifying the terms of probation affects the nature of the sanction imposed, it is immediately appealable as a 'final order'").

Citing D.C. Code § 24-304(a) (giving courts the authority to modify the terms and conditions of probation), *Jackson* did indicate courts could override CSOSA's decision to order GPS monitoring for a probationer. 214 A.3d at 479 & n. 49 (noting a probationer could seek judicial review of CSOSA's decision); *id*. at 480 (same).

"recognized . . . the term 'intermediate sanctions' [referenced in D.C. Code § 24-133(b)(2)(F)] plainly encompasses CSOSA's graduated-sanctions program." But for the reasons already discussed, we do not understand *Jackson* to have reached out to decide an issue that was not before the court in that case. Likewise, *Hunt* does not help the government. Analyzing the statute that makes it a crime to tamper with a detection device where the individual is required to wear it as a "condition of a protection order, pretrial, presentence, predisposition release, probation, supervised release, parole, or commitment or . . . while incarcerated," D.C. Code § 22-1211(a)(1)(A) (2012 Repl. & 2014 Supp.), *Hunt* held that a parolee could only be prosecuted for removing a GPS monitor imposed as a condition of release on parole by the Parole Commission or a court—not when the monitor had been imposed by CSOSA. 109 A3d at 623. In so doing, *Hunt* acknowledged the existence of CSOSA's regulation authorizing electronic monitoring as an administrative sanction, 109 A.3d at 622-24, but it did not endorse its legality for anyone, much less for supervised releasees under D.C. Code § 24-133, as that issue was never before the court.

Accordingly the legitimacy of CSOSA's regulations authorizing GPS monitoring as an administrative sanction is an open question.

## B.    Preservation

Before we can address this question, we must resolve our standard of review.

The government argues we must review only for plain error Mr. Davis's challenge to CSOSA's authority to impose GPS monitoring as an administrative sanction because he did not challenge a special needs justification for the installment of his GPS device before the trial court. We disagree. After Mr. Davis raised a Fourth Amendment challenge to a search via GPS monitoring by CSOSA in Superior Court, the burden was on the government to establish its actions complied with the Fourth Amendment. *Florida v. Royer,* 460 U.S. 491, 500 (1983) (recognizing that "[i]t is the State's burden to demonstrate" that a search or seizure falls under an exception to the warrant requirement); *see also Bennett v. United States,* 26 A.3d 745, 751 (D.C. 2011) ("Where a defendant shows that a warrantless search or seizure produced evidence that the government seeks to introduce at trial . . . the burden is on the government to . . . justify[] the search based on facts that could bring it within certain recognized, limited exceptions to the warrant requirement" (internal quotation marks omitted)). The government did not make a special needs argument at this juncture and thus did not cite to CSOSA's regulations to justify GPS monitoring of Mr. Davis thereunder.[4] *See supra* Part I.

---

[4] Even so, the Superior Court actually raised the question of the scope of CSOSA's authority, albeit outside the special needs framework the government had not invoked. *See supra* Part I. Thus it would be incorrect to say that the Superior Court was not "apprised" of a concern about CSOSA's authority. *See, e.g., Graves v. United States*, 245 A.3d 963, 969 (D.C. 2021) ("[W]e have held that a claim is not forfeited where, despite defense counsel's failure to object, the trial judge

Ignoring the fact that it was the government's burden to defend CSOSA's search via GPS monitoring, the dissent makes a different argument in support of plain error review. The dissent asserts that "appellant never argued that CSOSA's imposition of GPS monitoring was statutorily invalid." *Post* at 71. But this takes Mr. Davis's challenge to the lawfulness of CSOSA's regulations out of critical context. Where the government failed to argue in the trial court that the GPS search was constitutionally valid pursuant to the special needs doctrine, Mr. Davis cannot be faulted for not having made the argument that a special needs justification for the GPS search failed because this search was not conducted pursuant to a lawful, reasonable regulation. A defendant does not have to anticipatorily challenge an argument that the government does not make in opposition to a suppression motion to forestall plain error review on appeal. To the contrary, a defendant could

---

demonstrably was aware of the potential error and broached it sua sponte" because the "purpose of requiring a timely objection to the error, which is to alert the trial court and give it an opportunity to correct the error, has been met" (internal quotation marks omitted)); *Lewis v. United States*, 263 A.3d 1049, 1060 (D.C. 2021) (where trial court identified relevance as an issue, relevance challenge on appeal deemed preserved); *Chatmon v. United States*, 801 A.2d 92, 100 (D.C. 2002) (explaining "the purpose of the requirement of timely exceptions to trial errors is to alert the trial court and give it an opportunity to correct the error," and deeming challenge to government's rebuttal argument preserved where the trial court "broached *sua sponte* the subject of his discomfort with [this] argument"); *see also Abdus-Price v. United States*, 873 A.2d 326, 332 (D.C. 2005) (explaining that "parties on appeal 'are not limited to the precise arguments they made below' in support of their claims, . . . and 'even if a claim was not pressed below, it properly may be addressed on appeal so long as it was passed upon'" (internal citations omitted)).

ordinarily argue that the government had forfeited such an argument. *See Robinson v. United States*, 76 A.3d 329, 341 n.24 (D.C. 2013) (concluding that "the government forfeited its opportunity to defend its seizure and search of [the defendant] based on [a] new theory" not litigated in the trial court).

Recognizing that pressing for forfeiture would present its own complications where this court adopted the special needs rationale for GPS searches during the pendency of this appeal, Mr. Davis has not sought to argue the government has forfeited reliance on a special needs framework. Given the unusual posture of the case, and the fact that this court directed the parties to address the post-trial doctrinal development in *Jackson* in their briefs, which both did amply, we decline to hold either party strictly to the issues raised at the suppression hearing. *Cf. Parker v. United States*, 254 A.3d 1138, 1144 (D.C. 2021) (recognizing that a development of the law may constitute an "exceptional circumstance" permitting this court to exercise its discretion and excuse any waiver of an issue at trial). We thus turn to the question presented.

**C.     Analyzing CSOSA's Electronic Monitoring Regulation Under the Special Needs Test**

To assess the reasonableness of CSOSA's regulation that authorized the search of Mr. Davis, we first examine the origins and statutory structure of the District's supervised release system. We next consider the agency's regulation

regarding GPS monitoring in the context of Fourth Amendment doctrine. We conclude, based on these considerations, that CSOSA's regulation authorizing warrantless searches of releasees via GPS monitoring exceeds its statutory authority. Because the government can have no legitimate interest in the implementation of an unlawful regulation, the regulation was necessarily unreasonable under a Fourth Amendment special needs framework, as was the search of Mr. Davis.

## 1. The Authorized Roles of the Parole Commission and CSOSA to Oversee Supervised Releasees

In 1997, Congress passed the National Capital Revitalization and Self-Government Improvement Act, which mandated that the District abolish its parole system and instead implement a system of determinate sentences and supervised release under the authority of the United States Parole Commission. Balanced Budget Act of 1997, Pub. L. No. 105-33, §§ 11231-33, 111 Stat. 712, 745-51. The Parole Commission, a federal agency then primarily tasked with overseeing a dwindling number of federal parolees,[5] was assigned authority over all District residents released from prison into a mandatory period of supervised release. *Id.*

---

[5] *See* Peter B. Hoffman, *History of the Federal Parole System* 1-2, 14, United States Parole Commission (2003), https://www.justice.gov/sites/default/files/uspc/legacy/2009/10/07/history.pdf; https://perma.cc/VH9R-Y7Y5.

§ 11233(c)(2).[6]  The Revitalization Act also established a new federal agency, CSOSA, to which the Act designated the "supervision . . . [of] offenders on probation, parole, and supervised release . . . on behalf of the court or agency having jurisdiction over the offender being supervised." *Id.* § 11233(c)(1).  In allocating these duties, the Act specified that the "United States Parole Commission shall have and exercise the same authority as is vested in the United States district courts" under 18 U.S.C. § 3583(d)-(i) and that CSOSA officers "shall have and exercise the same powers and authority as are granted by law to United States Probation and Pretrial Officers."  *Id.* § 11233(c)(2), (d).  Section 11233 of the Revitalization Act was codified as D.C. Code § 24-133.

As in the Revitalization Act, section 24-133 in pertinent part directs that CSOSA carry out its supervisory responsibilities "on behalf of the . . . agency having jurisdiction over" the supervised releasee, D.C. Code § 24-133(c)(1), which the statute identifies as the Parole Commission, D.C. Code § 24-133(c)(2) (supervised releasees "shall be subject to the authority of the United States Parole Commission until completion of the term of supervised release").  And subsection (c)(2) again analogizes the Parole Commission to the federal district courts, stating that the Commission "shall have and exercise the same authority [over released offenders]

---

[6] *See* D.C. Code § 24-403.01(b)(2) (requiring supervised release following sentences of more than one year).

as is vested in the United States district courts by paragraphs (d) through (i) of § 3583 of title 18, United States Code . . . ." D.C. Code § 24-133(c)(2).[7] These U.S. Code provisions in turn provide that the district courts are the only decision-makers in the federal system authorized to impose discretionary conditions of supervised release. Specifically, 18 U.S.C. § 3583(d) mandates that "the [federal district] court shall" impose certain conditions of release and authorizes "[t]he court [to] order" other discretionary conditions as long as it concludes that certain criteria are met, including that the conditions "involve[] no greater deprivation of liberty than is reasonably necessary" to deter criminal conduct and protect the public. 18 U.S.C. § 3583(d)(2). The federal district courts also have the sole authority to modify conditions of release, so long as they similarly weigh factors including the degree of deprivation of liberty that is reasonably necessary. *See id.* § 3583(e)(2) (providing that "[t]he *court* may . . . modify, reduce, or enlarge the conditions of supervised release" (emphasis added)).

The federal circuits have affirmed that the federal district courts possess exclusive authority to impose or modify terms or conditions of release and "may not

_____

[7] The Sentencing Reform Amendment Act of 2000 ("SRAA"), D.C. Law 13-302, 47 D.C. Reg. 7249, incorporated similar language in what is now in D.C. Code § 24-403.01(b)(6): "Offenders on supervised release shall be subject to the authority of the United States Parole Commission until completion of the term of supervised release. The Parole Commission shall have and exercise the same authority as is vested in the United States District Courts by 18 U.S.C. § 3583(d)-(i)."

delegate to the Probation Department decisionmaking authority which would make a defendant's liberty itself contingent on a probation officer's exercise of discretion," meaning that "the extensive supervision mission of federal probation officers includes execut[ing] the sentence, but not imposing it." *United States v. Matta*, 777 F.3d 116, 122 (2d Cir. 2015) (internal citation and quotation marks omitted). *See id.* (recognizing that a "district court may delegate to a probation officer decisionmaking authority over certain minor details of supervised release—for example, the selection of a therapy provider or treatment schedule," but holding that the sentencing court may not delegate its sentencing authority to the United States Probation Department to determine whether a defendant should undergo inpatient or outpatient drug treatment as a special condition of supervised release); *see also United States v. Esparza*, 552 F.3d 1088, 1091 (9th Cir. 2009) (explaining "a probation officer may not decide the nature or extent of the punishment imposed upon a probationer," and reserving to the trial court the "determination of whether a defendant must abide by a condition" that implicates a defendant's liberty interests, such as the decision to order in-patient treatment (internal quotation marks omitted)); *United States v. Heath*, 419 F.3d 1312, 1315 (11th Cir. 2005) (holding the district court impermissibly "delegated to the probation officer not only the administrative supervision of [defendant]'s participation in the mental health program, but also the authority to make the ultimate decision of whether [defendant] had to participate at

all"); *United States v. Johnson*, 48 F.3d 806, 808 (4th Cir. 1995) (explaining that "making decisions about the amount of restitution, the amount of installments, and their timing is a judicial function and therefore is non-delegable").[8]  Thus, by statutory analogy under the Revitalization Act (as codified in D.C. Code§ 24-133(c)(2)), in the District of Columbia the Parole Commission has the sole authority to impose or modify conditions of supervised release, and then only after considering the releasee's liberty interests and the purposes served by the condition.

Concomitantly, as in the Revitalization Act, CSOSA's authority under D.C. Code § 24-133 is markedly different from that of the Parole Commission.  CSOSA is generally tasked with "provid[ing] supervision . . . for offenders on probation, parole, and supervised release" and "carry[ing] out its responsibilities on behalf of

---

[8] The government observes that these decisions were rooted in Article III nondelegation principles and issued subsequent to Congress's enactment in 1997 of D.C. Code § 24-133(c)(2) and its incorporation of the federal code.  But the government supplies us with no reason to conclude that Congress, at the time it enacted D.C. Code § 24-133, was unaware of the nondelegation principles undergirding the federal courts' authority.  Indeed prior to 2000, courts had "been faced many times with the question of the proper amount of authority to be delegated a probation officer," *United States v. Kent*, 209 F.3d 1073, 1078 (8th Cir. 2000), including in *Johnson*, which preceded the creation of CSOSA by several years, *see Johnson,* 48 F.3d at 809 (quoting *Arnold v. United States,* 271 F.2d 440, 441 (4th Cir. 1959) for the proposition that "duties imposed upon the Court cannot be discharged . . . by the probation officer").  It thus seems fair to assume both that Congress was familiar with nondelegation principles operating in the federal courts and that it chose to import similar nondelegation limits (albeit not constitutionally grounded) into D.C.'s supervised release scheme when it modeled the Parole Commission's authority over D.C. supervised releasees on that of the federal courts' over federal supervised releasees.

the court or agency having jurisdiction over the offender being supervised." D.C. Code § 24-133(c)(1). While the statute reiterates in subsection (c)(2) that CSOSA is responsible for supervising all people on supervised release in the District, the same subsection provides that all releasees are "subject to the authority of the United States Parole Commission." D.C. Code § 24-133(c)(2). And mirroring the language in subsection (c)(2) analogizing the Parole Commission to the federal district courts, subsection (d) provides that CSOSA officers "shall have and exercise the same powers and authority as are granted by law to United States Probation and Pretrial Officers." D.C. Code § 24-133(d). Federal probation and pretrial officers are assigned only administrative and supervisory duties over people on federal supervised release, such as informing releasees of their release conditions, staying informed about releasees' compliance, and recording and reporting on that compliance to the court as appropriate. *See* 18 U.S.C. § 3603; *see also Matta*, 777 F.3d at 122 (acknowledging federal probation officers' "decisionmaking authority over certain *minor* details of supervised release" (emphasis added)). Federal probation officers do not have unilateral authority to alter the terms of a person's release implicating their liberty interests, *see supra;* and if they wish those terms to be altered as a consequence for noncompliance with supervision or a violation of the court's conditions of release, absent a waiver by the supervised individual, they must request any changes through a court hearing. 18 U.S.C. § 3583(e)(2);

Fed. R. Crim. P. 32.1(c).

In other words, in the federal system there is a clear delineation between the adjudicatory authority, given to the federal district courts, and the administrative and supervisory authority, given to the federal probation office. With the enactment of legislation that was codified as D.C. Code § 24-133(c)(2) & (d), Congress adopted that division of authority in the District for the Parole Commission and CSOSA.

The government acknowledges D.C. Code § 24-133(c)(2) & (d) and § 24-403.01(b)(6) but asserts that another statutory provision authorizes CSOSA to impose GPS monitoring on Mr. Davis. The government looks to section 24-133(b)(2), which lists the powers and duties of the CSOSA Director, among them submitting annual appropriation requests and hiring supervision officers and support staff. Focusing on language that authorizes the Director to "[d]evelop and operate intermediate sanctions and incentives programs for sentenced offenders," D.C. Code § 24-133(b)(2)(F), the government argues that this provision authorizes CSOSA to unilaterally impose graduated "administrative sanctions" on releasees it determines to have violated their terms of release, and that GPS monitoring is a valid form of administrative sanction. We disagree that § 24-133(b)(2)(F), directing the Director of CSOSA to "[d]evelop and operate intermediate sanctions," can be read to authorize CSOSA to wield administrative sanctions authority that impinges on the Parole Commission's adjudicatory role.

The term "intermediate sanctions" appears in two places in the Revitalization Act: in the provisions authorizing the Director of CSOSA to "develop and operate" them, Revitalization Act § 11233(b)(2)(E) (codified as D.C. Code § 24-133(b)(2)(F)), and in a preceding provision creating and defining the mission of the Truth in Sentencing Commission, Revitalization Act § 11212 (codified as D.C. Code § 24-112). The Truth in Sentencing Commission was authorized to make recommendations to the Council for amendments to the D.C. Code for felony sentencing. *See id.* § 11212(a). In addition, the Commission was authorized to make "recommendations for implementation" to the Superior Court. Specifically, Revitalization Act § 11212(f)(1) (codified as D.C. Code § 24-112(f)(1)) directed the Commission to

> transmit to the Superior Court of the District of Columbia recommended rules and principles for determining the sentence to be imposed, including . . . [w]hether to impose a sentence of probation, a term of imprisonment and/or fine, and the amount or length thereof, and *including intermediate sanctions in appropriate cases*.

(emphasis added). We presume that the term "intermediate sanctions" in the Revitalization Act had the same meaning in both places it was used, *see Edwards v. United States*, 583 A.2d 661, 664 (D.C. 1990) (acknowledging the "presumption that identical words used in the same or related legislation were intended to have the same meaning"), and, as the initial reference clearly described *sentencing options* between incarceration or probation or a fine *for courts*, the latter reference did so as

well.[9] Thus, section 11233(b)(2)(E) of the Revitalization Act authorized the Director of CSOSA to "develop and operate" these intermediate sentencing options for the courts. It did not confer power on the CSOSA Director through the agency's officers to unilaterally impose administrative penalties on a supervised releasee upon a perceived violation of their conditions of release.

The Revitalization Act's understanding of the term "intermediate sanctions" persisted in subsequent related legislation enacted by the Council. One year after Congress passed the Revitalization Act, the Council passed the Advisory Commission on Sentencing Establishment Act of 1998, which created a successor Commission to the Truth in Sentencing Commission. D.C. Law 12-167, 45 D.C. Reg. 5180. This new Commission was again directed to make recommendations regarding felony *sentences* to ensure that, inter alia, they "provide[d] for use of intermediate sanctions in appropriate cases." D.C. Council, Report on Bill 12-550 at 6 (May 13, 1998). And three years after the Revitalization Act, the D.C. Council enacted the SRAA, *see supra* note 7, to resolve questions about the supervised release system left unanswered by the Revitalization Act itself. *See* D.C. Council,

---

[9] The dissent observes that the Balanced Budget Act also refers to "intermediate sanctions" in its Medicaid and Medicare+Choice provisions. *Post* at 60 n.15. But the dissent does not explain why the appearance of these words in a wholly unrelated substantive context in an entirely separate act within an omnibus bill undermines our reliance on their use in an obviously substantively related provision in the same act.

Report on Bill No. 13-696 at 2 (May 25, 2000). Here too, the Council appeared to adhere to an understanding of "intermediate sanctions" as sentencing options for courts; the committee report expressed a desire to give judges something other than "in/out" choices of pure incarceration and pure probation, such as work release, mandatory placement in a treatment center, or community corrections. *Id.* at 13-14 (explaining "[i]deally the [c]ourt would have the authority to impose a sanction which is more restrictive than probation but less restrictive than incarceration").

This understanding of "intermediate sanctions" is muddied somewhat by the fact that Congress amended D.C. Code § 24-133(b)(2)(F) in 2016 to include reference to "incentives" alongside "intermediate sanctions." *See* District of Columbia Courts, Public Defender Service, and Court Services and Offender Supervision Agency Act of 2015, Pub. L. 114-118, § 3(a), 130 Stat. 9, 13 (2016). The accompanying congressional committee materials indicate that the legislature at this later point in time understood this subsection to have granted CSOSA "specific statutory authority to punish sentenced offenders"—the nature of which is unspecified—and wished to authorize the corresponding use of "programmatic incentives" such as bus fares or fees for GED tests. *See* S. Rep. No. 114-110, at 2-3 (2015).

Where does this leave us? We accept that Congressional reenactment of a statutory provision can, where there is "a showing of both congressional awareness

and express congressional approval of an administrative interpretation of that provision," change the prior meaning of statutory language. *Gen. Am. Trans. Corp. v. ICC*, 872 F.2d 1048, 1053 (D.C. Cir. 1989); *see also Sawyer Prop. Mgmt. of Md., Inc. v. D. C. Rental Hous. Comm'n*, 877 A.2d 96, 108 (D.C. 2005) ("At best the reenactment of statutes is a nebulous foundation for statutory construction, and before a mere reenactment can be given conclusive effect as a [legislative] adoption of an administrative interpretation, it must be shown that [the legislature] was conscious that it was doing so." (internal quotation marks omitted)). Although we see no indication in the legislative history that Congress was *consciously* discarding its previous understanding of "intermediate sanctions" in D.C. Code § 24-133(b)(2)(F) as a sentencing option, we assume for purposes of this opinion that with the amendment to that statute authorizing the CSOSA Director to "[d]evelop and operate intermediate sanctions and incentives programs for sentenced offenders," CSOSA itself now holds some authority under its regulations to *administratively* sanction—or incentivize—supervised releasees. 28 C.F.R. § 810.3(a), (b).

It is "well[-]established," however, that administrative sanctions are distinct from the conditions of release that the Parole Commission alone imposes. *Hunt*, 109 A.3d at 623. Recognizing our obligation to read D.C. Code § 24-133 as a coherent whole, we decline to read the statute in such a way as to grant CSOSA an administrative sanction authority that encroaches upon or overtakes the Parole

Commission's adjudicatory authority—authority which the Council has never sought to modify. *See In re T.L.J.*, 413 A.2d 154, 158 (D.C. 1980) (noting the "well-accepted tenet of statutory construction that, whenever possible, a statute should be interpreted as a harmonious whole" (internal quotation marks omitted)); *Gondelman v. D.C. Dep't of Consumer & Regul. Affs.*, 789 A.2d 1238, 1245 (D.C. 2002) ("In construing two subsections, we must at the same time give effect to the whole statute . . . ." (cleaned up)). Put another way, taking D.C. Code § 24-133(c)(2) & (d) and § 24-133(b)(2)(F) together, it is clear that (1) as the sole adjudicatory authority in the supervised release system, only the Parole Commission may impose or modify conditions of release, and (2) whatever CSOSA's administrative sanctions authority is, it must not transgress on the Parole Commission's adjudicatory role. We thus consider on what side of this divide GPS monitoring falls.[10]

---

[10] We reject the dissent's argument that Congress, with the passage of the 2016 amendments to D.C. Code § 24-133(b)(2)(F), *knew* that CSOSA had already claimed unilateral authority to impose GPS monitoring as a sanction and legislatively blessed this practice. Had this been the case, one would expect Congress to have (1) mentioned GPS monitoring and (2) commented on the need to legitimize its previously unauthorized unilateral imposition by CSOSA. But legislative history of the 2016 amendments reflects neither of these things. In its absence, the dissent looks to a grab bag of statements *by CSOSA* made at budget and oversight hearings from years earlier about the use (not the legality) of GPS monitoring and even more generally to CSOSA's 2003 notice in the Federal Register about its claimed authority to impose "graduated sanctions," not identified to include GPS monitoring. *See Post* at 51-54. These statements cannot be relied upon to show Congress's knowledge and endorsement in 2016 of CSOSA's unilateral imposition of GPS monitoring as an "intermediate sanction."

### 2.    Warrantless Searches of People on Supervised Release

In the federal system, the division of authority between the courts and the probation office holds for warrantless searches, including GPS monitoring, which the courts alone can impose as a discretionary condition of release. *See* 18 U.S.C. § 3583(d) (providing that "[t]he *court* may order" the imposition of discretionary conditions of release (emphasis added)); *see also* Admin. Off. of the U.S. Courts, *Overview of Probation and Supervised Release Conditions* 70-74, 78-80 (2016), https://www.uscourts.gov/sites/default/files/overview_of_probation_and_supervised_release_conditions_0.pdf; https://perma.cc/G5QN-QYMQ (providing that discretionary conditions of release that the court can impose include location monitoring via GPS and warrantless search and seizure). Federal probation officers have no independent authority to search releasees, including by subjecting them to GPS monitoring. For a person to be placed on GPS monitoring in the federal system, the monitoring must be ordered by the court.[11]

---

[11] This allocation of authority appears clear enough that neither the government nor the dissent can identify any case from the federal courts of appeals where a federal probation officer sought to or did impose GPS monitoring on a person without court approval, let alone one where a court blessed this practice. The government points to *United States v. Durham*, 618 F.3d 921 (8th Cir. 2010), and *United States v. Mickelson*, 433 F.3d 1050 (8th Cir. 2006), but in those cases, both from one Circuit, the court had specifically ordered that the supervisee in question submit to location tracking at the probation office's discretion. *Durham*, 618 F.3d at 932; *Mickelson*, 433 F.3d at 1056. This is a distinct and distinguishing

Consistent with federal courts' treatment of searches generally and GPS monitoring in particular as conditions of release, the Parole Commission treats the condition of warrantless searches as one imposed on supervised releasees only at its discretion. Compliance with warrantless searches is not a standard condition under the Commission's regulations. *See* 28 C.F.R. § 2.204(a)(3)-(6). Rather, such warrantless searches are authorized only when the Commission specifies it as a "special condition" of release, imposed on a case-by-case basis. *Id.* § 2.204(b)(2)(iv). In line with 18 U.S.C. § 3583(d), which D.C. Code § 24-133(c)(2)

---

circumstance both subject to question under cases like *Matta*, 777 F.3d at 122, cited *supra* Part II.C.I, and not present here, as discussed *infra* Part II.D.

The dissent asserts that we fail to "adequately explain" why GPS monitoring should not be viewed as administrative sanction. *Post* at 56. But the answer is that GPS monitoring has been deemed both a search by the Supreme Court, *see supra* Part II.A., and a condition of release by the federal courts. The dissent's cases are not to the contrary. They just show that the federal appellate courts have discerned impermissible delegations of judicial authority regarding conditions of supervised release in a variety of contexts. And the one unpublished decision the dissent cites for the questionable proposition that "home detention is . . . more onerous than GPS monitoring," *United States v. Fiume*, 643 F. App'x 25, 28 (2d Cir. 2016), actually upholds the trial court's imposition of GPS monitoring as a condition of release.

As for the one state court decision the dissent cites, *Commonwealth v. Cory*, 911 N.E.2d 187, 195 (Mass. 2009), we disagree it supports the proposition that GPS monitoring is only a condition of release when it is imposed for the entire supervision period. *Id*. at 189 (holding that it would violate the Ex Post Facto Clause to apply a statute requiring all probationers convicted of sex offenses to wear GPS monitors for the duration of their probation to defendant because it post-dated the commission of his offense). In any event, state court decisions do not provide helpful guidance where Congress has reserved to the Parole Commission the same authority possessed by federal trial courts to impose conditions of release.

incorporates, the Parole Commission must "determine that imposing the condition is reasonably related" to (1) the "nature and circumstances" of a given case, and (2) the purpose of deterrence, protection of the public, or both. *Id.* § 2.204(b)(1). The Parole Commission must also weigh "whether the condition involves no greater deprivation of liberty than is reasonably necessary" to serve the purpose identified. *Id.* To modify a person's conditions of release—for example, to impose a special search condition as a consequence of a violation—the Parole Commission must consider the same criteria and then provide the releasee with notice and a ten-day period to object.[12] *Id.* § 2.204(c).

---

[12] The Commission's regulations direct releasees supervised by CSOSA to "comply with the sanction(s) imposed by the supervision officer and as established by an approved schedule of graduated sanctions," 28 C.F.R. § 2.204(a)(6)(vi). But the regulations do not indicate the nature or scope of sanctions that the Parole Commission deems permissible to impose. Much less do they expressly purport to carve out GPS monitoring from the other types of special conditions of release— including searches—that the Commission reserves to its discretion, 28 C.F.R. § 2.204(b)(1)(4) (listing special conditions of release "we," i.e., the Commission "may impose"), and authorize CSOSA to unilaterally search a supervised releasee via GPS.

But even if the Commission's regulations purported to expressly subdelegate to CSOSA some measure of the Commission's delegated-by-Congress authority to impose conditions of release, that subdelegation would have no legal force. Although "[w]hen a statute delegates authority to a federal officer or agency, subdelegation to a subordinate federal officer or agency is presumptively permissible," *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004), "[t]here is no [permissibility] presumption covering subdelegations to outside parties." *Id.* Rather, "subdelegation to outside parties are assumed to be improper absent an affirmative showing of congressional authorization." *Id.* (citing, inter alia, *Shook v. D.C. Fin. Resp. & Mgmt. Assistance Auth.*, 132 F.3d 775, 783-84 & n.6

The Parole Commission's *Rules and Procedures Manual* (2010), which is posted on the Commission's website,[13] underscores that the Commission regards unilateral searches of releasees to be beyond the discretion of CSOSA and its officers.[14]   According to the Manual, "[s]earches by Supervision Officers are

---

(D.C. Cir. 1998)).  Here, CSOSA is not within the Commission's chain of command. *See* 18 U.S.C. § 4203 (Powers and Duties of the Commission) & § 4204 (Powers and duties of the Chairman) [Repealed].  Rather, it is an outside entity.  *See, e.g., Shook*, 132 F.3d at 784 (rejecting argument that the Emergency Transitional Education Board of Trustees was a lawful "subdelegee" of the District of Columbia's Financial Responsibility and Management Assistance Authority (Control Board), notwithstanding the Board of Trustees's obligation to "report to the [Control Board]" and the fact that their decisionmaking powers "are subject to the Control Board's approval" because the Board of Trustees was a separate entity from the Control Board); *see also U.S. Telecom Ass'n*, 359 F.3d at 213 (explaining that "[w]hen an agency delegates its authority to its subordinate, responsibility—and thus accountability—*clearly remain with* the federal agency" (emphasis added)).  Thus, in order for the Commission to subdelegate some of its conditions-of-release powers to an outside entity like CSOSA, Congress or the Council would have had to affirmatively authorize such subdelegation.  But no statute expressly authorizing such subdelegation by the Commission exists.  *Compare Gentiva Healthcare Corp. v. Sebelius*, 723 F.3d 292, 296 (D.C. Cir. 2013) (subdelegation to external private contractor permitted where congress expressly authorized the Secretary of Health and Human Services to "perform any of [her] functions under this subchapter directly or by contract . . . ,as the Secretary may deem necessary" (original emphasis omitted)) *with Shook*, 132 F.3d at 783-84; *see, e.g.,* 18 U.S.C. § 4203(c)(3) [repealed] (conferring power on the Commission to "delegate authority to conduct [parole] hearings held pursuant to section 4214 to any officer or employee of the executive or judicial branch of Federal or State government").

[13] https://www.justice.gov/d9/uspc/legacy/2010/08/27/uspc-manual111507.pdf;    https://perma.cc/XXU2-RGC7.    *See* https://www.justice.gov/uspc (under "Resources"); https://perma.cc/2XBY-UHZ5.

[14] The Manual does list "curfew with electronic monitoring" as one of the graduated sanctions that CSOSA may impose. *USPC Rules and Procedures Manual*

disfavored" compared to other supervisory techniques, in part because the Parole Commission recognizes the Fourth Amendment implications of warrantless searches and the "restrictions on the liberty of the releasee" that search conditions entail. *USPC Rules and Procedures Manual* § 2.204-18(a). If a supervision officer does wish to conduct a search of a releasee, then the search "should be conducted only (1) pursuant to conditions of release that specifically permit such searches or (2) pursuant to the consent of the releasee freely and voluntarily given." *Id.*; *accord id.* § 2.204-18(d)(1) ("A search of the person . . . may be conducted by a Supervision Officer only upon consent or pursuant to a special condition of release, as provided by these guidelines."). And the rules are clear that the Parole Commission assumes exclusive authority to impose search conditions, as with any other conditions of release. *Id.* § 2.204-18(b)(1).

Consonantly, CSOSA does not, in its own regulations, claim the general

---

§ 2.204-21. But this language traces back at least to the 1997 version of the *Manual*, which pre-dated use of GPS monitoring technology and could only have referred to the location- and time-bound radio-frequency technology then available. *See* discussion *infra* Part II.C.3 and U.S. Parole Commission, *U.S. Parole Commission Rules & Procedures Manual* § 2-40(e) (1997). The distinctions between that form of sanction and the 24-hour surveillance Mr. Davis experienced aside, the most recent version of the *Manual* was published in 2010, well predating the Supreme Court's 2015 decision in *Grady* that clarified that GPS monitoring should be considered a search under the Fourth Amendment. It is therefore far from clear that the Parole Commission understood that "curfew with electronic monitoring" may be subject to the same Fourth Amendment considerations as other searches when it published these rules.

authority to search those under its supervision at its discretion, without a warrant or other authorization. But CSOSA's regulations provide that, if a releasee's supervision officer "has reason to believe" the releasee has failed to abide by the conditions of their release, the releasee "will be in violation of the conditions" and the officer "may then impose administrative sanctions." 28 C.F.R. § 810.3(a). Many of the listed sanctions are simply extensions of preexisting supervisory conditions, such as increasing mandatory check-ins, drug testing, or group activities. *Id.* § 810.3(b). The list also includes "[e]lectronic monitoring for a specified period of time," *id.* § 810.3(b)(6), but the regulation does not otherwise suggest that requiring a releasee to submit to searches protected by the Fourth Amendment without Parole Commission authorization is an available administrative sanction.[15] And the regulations acknowledge that CSOSA's sanctions decisions remain subject to the Commission's override or modification. *See id.* § 810.3(c). This regulation

---

[15] One of the listed administrative sanctions is "[i]ncreased drug testing." 28 C.F.R. § 810.3(b)(3). This court has recognized that drug testing implicates the Fourth Amendment. *See In re G.B.*, 139 A.3d 885, 893-94 (D.C. 2016) (citing *Skinner v. Ry. Lab. Execs. Ass'n*, 489 U.S. 602, 617 n.4, 618 (1989)); *Oliver v. United States*, 682 A.2d 186, 189-93 (D.C. 1996); *see also United States v. Stephens*, 424 F.3d 876, 882-83 (9th Cir. 2005) (concluding that, in the federal system, the court and not the supervision officer must determine the maximum frequency of drug testing). The drug testing sanction is not in question in this case, and we do not decide its validity here. Nor do we decide the validity of "[p]lacement in a residential sanctions facility or residential treatment facility for a specified period of time" as a unilateral administrative sanction, 28 C.F.R. § 810.3(b)(8), which, Mr. Davis argues, also implicates significant liberty interests.

permitting "electronic monitoring" is what the government asserts authorized Mr. Davis's placement on 24/7 GPS tracking.

### 3. The Reasonableness of CSOSA's Electronic Monitoring Regulation

We assess the reasonableness of CSOSA's electronic monitoring regulation against the statutory backdrop discussed above and in the context of its origins. Historically, location monitoring of people on parole, probation, or supervised release was limited to radio-frequency (RF) technology, which was used "principally for home detention applications." Harold I. Heaton, *GPS Monitoring Practices in Community Supervision and the Potential Impact of Advanced Analytics* 1, Nat'l Inst. of Just. (2016). Like GPS monitoring, RF technology requires the physical attachment of a tracking device to a person. But unlike GPS, its use is limited to confirming a person's presence at or absence from a particular location or a limited range therefrom, during specific hours. *See Federal Location Monitoring*, United States Courts, https://www.uscourts.gov/services-forms/probation-and-pretrial-services/supervision/federal-location-monitoring; https://perma.cc/HE66-N3T9 (last visited May 11, 2023). In 2001, CSOSA promulgated a regulation authorizing its administrative sanctions program and included "[e]lectronic monitoring for a specified period of time" as one of the available sanctions. *See* Community Supervision: Administrative Sanction Schedule, 66 Fed. Reg. 48336, 48338 (Sept.

20, 2001) (codified at 28 C.F.R. pt. 810). At the time it was drafted, the regulation used the term "electronic monitoring" in its "traditional[]" sense, which was "curfew monitoring of individuals confined to their homes (or other locations) by RF-based systems." *See* Heaton, *supra*, at 1 n.3 (internal quotation marks omitted).

Two years after this regulation was promulgated, in 2003, CSOSA adopted GPS tracking technology for supervisory purposes. CSOSA, *GPS and Offender Supervision in Washington, D.C.*, D.C. Public Safety Radio (May 31, 2013), https://media.csosa.gov/podcast/transcripts/gps-and-offender-supervision-in-washington-d-c-dc-public-safety-radio/; https://perma.cc/N7JL-VWX8. The agency's reach into the lives of those whom it supervised in this manner thus extended enormously. CSOSA's GPS monitoring system "tracks and records the movements of the GPS devices in one-minute increments, twenty-four hours a day, seven days a week." *Jackson*, 214 A.3d at 470. As the agency began using this more intrusive mode of surveillance, however, no corresponding amendment to its regulations ensued. Rather, CSOSA continued to rely on its preexisting regulation authorizing it to impose "electronic monitoring" as an administrative sanction. *See* Community Supervision: Administrative Sanctions, 68 Fed. Reg. 19738, 19738 (Apr. 22, 2003) (codified at 28 C.F.R. pt. 810) (finalizing interim regulations published in September 2001 that referred only to "electronic monitoring").

In the 2010s, the Supreme Court made clear in a series of decisions that GPS

monitoring was a search subject to Fourth Amendment protections because of a person's privacy interests in both their physical person and their movements. *See supra* Part II.A. Neither CSOSA's nor the Parole Commission's rules and regulations appear to have been amended to reflect this shift in the constitutional landscape. CSOSA appears to have continued to treat location monitoring, including around-the-clock, everywhere-you-go GPS tracking, as a sanction subject to its discretion, while the Parole Commission treated all other Fourth Amendment searches as conditions requiring its approval.[16]

We conclude that this regulatory scheme allowing CSOSA to unilaterally order GPS searches is unlawful under the statutory scheme which entrusts the Parole Commission with the equivalent power of a federal trial court to impose conditions of release (including the condition that a person subject themselves to search), and

---

[16] The government argues that this court should construe the fact that the legislature has not acted to curtail CSOSA's use of GPS monitoring in its graduated sanctions program as approval of that practice by the agency. We are doubtful of the interpretive weight that legislative inaction should be given here. *Rivera v. Lew*, 99 A.3d 269, 275 (D.C. 2014) ("[W]e have often noted the hazard of attempting to impute meaning to legislative inaction unless it is absolutely clear the [legislature] can be said to have known about an issue, cared about it, and somehow dealt with it." (internal quotation marks omitted)). This skepticism holds especially true where, as here, the inaction cuts both ways: even as it became clear that the imposition of GPS monitoring was an exclusively adjudicatory function in the analogous federal system, the legislature also left in place the language in D.C. Code § 24-133(c)(2) & (d) that requires CSOSA to act "on behalf of" the entity (here the Parole Commission) with "jurisdiction" over the supervised releasee and that directs that the Commission and CSOSA shall have the same powers as the federal courts and the Probation Office, respectively.

is unreasonable under the Fourth Amendment.

On one side of the balance of interests, it is well established that 24-hour GPS surveillance represents a "serious intrusion on personal privacy," both from the trespass on the person and "the government's prolonged, minute-by-minute tracking and recording of all of a person's movements and whereabouts." *Jackson*, 214 A.3d at 477. In the CSOSA system, those movements and whereabouts are stored indefinitely and made available to multiple government agencies, meaning the scope of the privacy intrusion reaches far beyond a person's individual supervision officer. *See supra* Part I. Further, GPS monitoring also encroaches upon a releasee's liberty interests: the maintenance of the tracking device imposes daily or even continuous restrictions on the releasee's actions, *see id.*, and failing to comply with these restrictions can lead to additional restrictions all the way up to re-incarceration, *cf. Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 833-34 (2002) (weighing the *lack* of law enforcement or disciplinary consequences from a special needs search in favor of the search's reasonableness).

On the other side of the balance, the government has no counterweight; it cannot have a significant interest in one of its agencies conducting Fourth Amendment searches in excess of the agency's statutory authority. *Cf. Moore v. Gaither*, 767 A.2d 278, 284 (D.C. 2001) ("[A] regulation may properly govern only those matters that the statute authorizes it to govern . . . ."). As we have held

previously, CSOSA need not obtain a warrant every time it wishes to search a person on supervised release. *Atchison*, 257 A.3d at 531. But, as laid out here, the statutory division of authority demands that such conduct be authorized by the U.S. Parole Commission, which by its own regulations offers substantive and procedural safeguards to ensure searches are conducted only when appropriate, as a formal condition of release. *See supra* Part II.C.2.

Needless to say, the Parole Commission's broad (and pre-*Grady*) regulatory directive that releasees comply with CSOSA's graduated sanctions program, 28 C.F.R. § 2.204(a)(6)(vi), see *supra* note 12, cannot override that statutory mandate. Agencies may only wield the authority given to them by their organizing statutes. *District of Columbia v. Brookstowne Cmty. Dev. Co.*, 987 A.2d 442, 449 (D.C. 2010) ("Agencies are creatures of statute and their authority and discretion are limited to that which is granted under their founding statutes. Therefore, regulations they enact pursuant to that statutorily provided authority cannot expand that authority."). And they cannot (without statutory authorization) delegate their powers to other agencies. *See District of Columbia v. White*, 435 A.2d 1055, 1057 (D.C. 1981) (stating that a "prohibitive or conflicting statute or authority [could] preclude[] . . . delegation" of powers by an agency like the Commission); *cf. Bayou Lawn & Landscape Servs. v. Sec'y of Lab.*, 713 F.3d 1080, 1084–85 (11th Cir. 2013) ("Even if it were not axiomatic that an agency's power to promulgate legislative regulations is limited to

the authority delegate[d] to it by Congress, we would be hard-pressed to locate that power in one agency where it had been specifically and expressly delegated by Congress to a different agency." (internal citation omitted)). 18 U.S.C. § 3583(d), which is incorporated in D.C. Code § 24-133(c)(2), makes evident that the Parole Commission could not delegate outright the imposition of conditions of release to CSOSA. *See supra* Part II.C.1. It follows that the Commission could not make the same delegation implicitly via its regulations.[17]

In reaching our conclusion that GPS monitoring as a search may only be ordered by the Commission, just as it may only be ordered by a court in the federal supervised release system, we are not, as the dissent charges us, "nullifying" D.C. Code § 24-133(b)(2)(F), *see Post* at 64. Rather, we are reading this provision as a harmonious whole with D.C. Code § 24-133(c)(2) & (d), and holding that whatever powers CSOSA has to administratively sanction supervised releasees, they do not include unilaterally subjecting releasees to GPS monitoring because such a power would arrogate to CSOSA what has been reserved to the Commission through D.C.

---

[17] The dissent argues that there is no unlawful delegation however if "CSOSA's sanctions decisions remain subject to the Commission's override or modification." *Post* at 62. The process by which a supervised releasee might seek Commission review of a CSOSA decision to impose GPS monitoring *before* such monitoring commences is unexplained. And again, the statute entrusts to the Commission the same authority federal courts possess to impose conditions of release, and GPS monitoring as a condition is not delegated to the reviewable discretion of probation officers. D.C. Code § 24-133(c)(2) & (d).

Code § 24-133(c)(2) & (d).

*        *        *

For the reasons set forth above, we conclude that CSOSA's electronic monitoring regulation is not a reasonable regulation on which a special needs search may be based. In light of this conclusion, we do not reach Mr. Davis's other special needs arguments that even under CSOSA's electronic monitoring regulation he should not have been eligible for GPS monitoring as a "high risk" releasee, *see Jackson*, 214 A.3d at 479 (stating that the fact that CSOSA "reasonably limit[ed] its use [of GPS tracking] to high-risk" probationers weighed "heavily in favor of the search's reasonableness"), and that the extended duration of his GPS monitoring exceeded that which was authorized under CSOSA's electronic monitoring regulation.

### D. *Knights* and *Samson* Are Inapplicable

Finally, while acknowledging that our precedents indicate that this court may assess this case under a special needs framework, the government argues that we need not do so because *United States v. Knights*, 534 U.S. 112 (2001), and *Samson v. California*, 547 U.S. 843 (2006), provide an independent basis to justify CSOSA's actions. *Knights* and *Samson* each engaged in a general totality-of-the-circumstances analysis and concluded that law enforcement acted reasonably in searching parolees and probationers without a warrant and outside of the "special

needs" framework; the government would have us do likewise and conclude, like the trial court, that CSOSA's warrantless GPS monitoring was reasonable under the totality of the circumstances.

In so arguing, the government leaves out a key circumstance distinguishing these cases. In *Knights* and *Samson*, law enforcement officers were expressly authorized by statute or a court to search probationers and parolees, respectively, without a warrant. In *Samson*, the Supreme Court stressed that a California statute required parolees "to submit to suspicionless searches by a parole officer or other peace officer at any time." 547 U.S. at 852 (internal quotation marks omitted). Similarly, a probation order imposed by a judge in *Knights* allowed "any probation officer or law enforcement officer" to "search [Mr. Knights] at any[]time, with or without a search warrant, warrant of arrest or reasonable cause." 534 U.S. at 114, 119-120. These explicit authorizations specifically permitting law enforcement officers to search parolees and probationers at any time were what provided the grounds for the searches. Therefore, the court did not need to assess the reasonableness of any regulation governing the law enforcement agencies in question; the explicit authorizations, not the regulations, were what stood in for the standard warrant requirement.

Here, CSOSA had no such explicit authorization to search Mr. Davis, through a Commission-imposed condition or otherwise, and as we explained herein it lacked

the authority to conduct the search in absence of the Parole Commission's approval. Had the Commission imposed a special condition of release on Mr. Davis authorizing warrantless searches generally or GPS monitoring specifically, Mr. Davis would be more similarly situated to Mr. Knights and it would likely then be appropriate to assess whether, under the totality of the circumstances, CSOSA's search of Mr. Davis was reasonable. But in the absence of such a condition, Mr. Davis's expectation of privacy was not diminished to the same extent that Mr. Knights's and Mr. Samson's were. We conclude that it would be inappropriate to apply the logic of *Knights* and *Samson* in this case.

### E. Conclusion

CSOSA possesses significant authority to monitor the actions of people on supervised release. But given the statutory landscape surrounding its operations and the constitutional constraints on warrantless searches, its regulations may not reasonably authorize its officers to impose electronic monitoring in the form of GPS tracking on supervised releasees absent the express authorization of the Parole Commission and its procedures that protect against other Fourth Amendment searches of releasees' persons. Therefore, the GPS data collected from Mr. Davis should have been suppressed under a special needs analysis. We thus reverse the denial of Mr. Davis's suppression motion, vacate Mr. Davis's conditional guilty plea, and remand for further proceedings consistent with this opinion.

*So ordered.*

THOMPSON, *Senior Judge*, dissenting: Having served a term of imprisonment for armed robbery, appellant Davis began a period of supervised release in 2013.[1] In May 2016, during the supervision period, he was arrested on a charge of assault on a police officer. His Community Supervision Officer ("CSO") from the Court Services and Offender Supervision Agency ("CSOSA") referred him for GPS monitoring as a sanction for failure to comply with his conditions of release. Ten days before appellant's CSO discharged him from GPS monitoring, the Metropolitan Police Department ("MPD") responded to a report of an armed carjacking. MPD subsequently searched the location records of all people on CSOSA GPS monitoring to identify anyone who was near the carjacking site at the time of the incident. That search linked appellant to the time and location of the carjacking and also to the area where MPD later found the car. As a result, appellant was indicted in connection with the incident. He entered a conditional guilty plea, reserving the right to challenge denial of his motion to suppress the evidence derived from the GPS monitoring that had linked him to the crime.

---

[1] It appears that at the time, appellant was also on probation for a Maryland offense.

My colleagues in the majority now conclude that the GPS data collected from appellant should have been suppressed. They do so primarily based on their acceptance of arguments by appellant that in my view are demonstrably wrong and that, in any event, should have been subjected to plain-error review and rejected on the ground that there was no obvious error in the Superior Court ruling denying appellant's motion to suppress.

The majority opinion accepts appellant's argument that CSOSA's regulation (28 C.F.R. § 810.3(b)(6) (2023)) that authorizes CSOs to impose electronic monitoring (here, in the form of GPS tracking) as a sanction for a supervised releasee's violation of conditions of release "exceed[s] the agency's legal authority" (or, in the words of the majority opinion, "falls outside the agency's statutory authority"). *Ante* at 3, 4, 19, 38-39 and *passim*. Yet, as I discuss in more detail below, the plain language of CSOSA's authorizing statute, its legislative history, and CSOSA's interpretation of its statutory mandate as made known to Congress all confirm CSOSA's statutory authority to operate its sanctions program. In a nutshell, in amending the CSOSA-authorizing statute in 2016, Congress (1) expressed its understanding that the statute theretofore had authorized CSOSA to impose sanctions for supervisees' non-compliance with their conditions of release and (2) with that understanding, re-authorized CSOSA's use of sanctions (and additionally authorized CSOSA to develop and operate a program of incentives to

encourage compliance with conditions of release). Congress re-enacted that authorization while having been made aware that CSOSA understood itself to have discretion to place supervised releasees on GPS monitoring as a sanction for non-compliance with conditions of release without needing to delay action to seek court or United States Parole Commission ("Parole Commission" or "USPC") approval. In light of these clear expressions of legislative intent, my colleagues' conclusion that the CSOSA regulation is beyond CSOSA's statutory authority does not withstand scrutiny.

## A. The statutory background

Through the National Capital Revitalization and Self-Government Improvement Act of 1997 (the "Revitalization Act" or the "Act"), part of the Balanced Budget Act of 1997, Pub. L. No. 105-33, §§ 11231-33, 111 Stat. 712, 745-51, Congress established CSOSA as a new federal agency responsible for the "supervision . . . for offenders on probation, parole, and supervised release . . . on behalf of the court or agency having jurisdiction over the offender being supervised." *Id.* § 11233(c)(1) (codified at D.C. Code § 24-133(c)(1)). Inter alia, CSOSA's Director is to "determine . . . uniform supervision . . . practices for the Agency." *Id.* § 11233(b)(2)(B) (codified at D.C. Code § 24-133(b)(2)(B)). While the Act required CSOSA to "supervise any offender who is released from imprisonment for any term of supervised release imposed by the Superior Court of the District of Columbia," it

also mandated that such offenders "shall be subject to the authority of the United States Parole Commission [the "Parole Commission"] until completion of the term of supervised release." *Id.* § 11233(c)(2) (codified at D.C. Code § 24-133(c)(2)). As to persons serving terms of supervised release imposed by the Superior Court, the Parole Commission generally "shall have and exercise the same authority as is vested in the United States district courts" under 18 U.S.C. § 3583. *Id.*

Under D.C. Code § 24-133(d), enacted as part of the Revitalization Act, CSOSA supervision officers "shall have and exercise the same powers and authority as are granted by law to United States Probation and Pretrial Officers." *Id.* § 11233(d). The Act also mandated, however, that the CSOSA Director "shall . . . develop and operate intermediate sanctions programs for sentenced offenders." *Id.* § 11233(b)(2)(F) (codified as amended at D.C. Code § 24-133(b)(2)(F)). The Revitalization Act did not define the term "intermediate sanctions."[2] But in 2016,

---

[2] Congress may have perceived no need to do so because the term, also used elsewhere in the Balanced Budget Act, has a commonplace meaning: a sanction that is not as severe as the most severe available sanction but more severe than the least severe one. *See, e.g.*, Balanced Budget Act § 4707(e), 111 Stat. 489, 503-04 (adding to 42 U.S.C. § 1396v a new paragraph pertaining to the use of intermediate sanctions, i.e., sanctions other than contract termination, against Medicaid managed care organizations that violate HHS rules protecting enrollees); *see also, e.g.*, Regulations Governing Practice Before the Internal Revenue Service, 67 Fed. Reg. 48760, 48762 (July 26, 2002) (referring to censure as an intermediate sanction, short of the more significant sanctions of suspension or disbarment, that can be invoked to discipline errant practitioners who practice before the IRS); Medicare Program; Appeal Rights and Procedures for Beneficiaries Enrolled in Prepaid Health

Congress enacted new legislation to expand CSOSA's authority. *See* District of Columbia Courts, Public Defender Service, and Court Services and Offender Supervision Agency Act of 2015, Pub. L. 114-118, § 3(a), 130 Stat. 9, 13 (2016). In its Report on the bill that culminated in that legislation (the DC Court Services and Offender Supervision Agency Act of 2015, S. Rep. No. 114-110 (2015)), the Committee on Homeland Security and Governmental Affairs explained its understanding that CSOSA "has specific statutory authority to punish sentenced offenders but lacks statutory authority to improve reentry programs by offering incentives to those sentenced offenders who succeed." *Id.* at 2. The Committee explained that "[w]ith the authority provided under this bill, the agency could provide simple, low cost items to former offenders such as bus fares to job interviews and fees for GED tests if those offenders are doing particularly well in the reentry program." *Id.* The legislation amended D.C. Code § 24-133(b)(2)(F)), so that instead of mandating the CSOSA Director just to "[d]evelop and operate

---

Care Plans, 59 Fed. Reg. 59933, 59937 (Nov. 21, 1994) (referring to use of intermediate sanctions to penalize Medicare/Medicaid providers for program non-compliance); Clinical Laboratory Improvement Act Programs; Fee Collection, 55 Fed. Reg. 31758, 31759 (Aug. 3, 1990) (pertaining to loss of certification, loss of Medicare approval, or instead intermediate sanctions that may be imposed on clinical laboratories that fail to meet applicable requirements of the Clinical Laboratory Improvements Act); Broadcast Services; Broadcast Hoaxes, 57 Fed. Reg. 28638, 28639 (June 26, 1992) (providing the FCC "with the option of imposing an intermediate sanction [that] has more deterrence value than admonition but [] is less drastic than license revocation or non-renewal," so as to deter the broadcast of serious hoaxes).

intermediate sanctions for sentenced offenders," it requires the Director to "develop and operate intermediate [sanctions] *sanctions and incentives*." *Id.* at 10 (brackets and italics indicating that the word "sanctions" was stricken and the phrase "sanctions and incentives" was added). Thus, in enacting the legislation, Congress re-enacted the CSOSA Director's mandate with an express understanding that this mandate included "specific statutory authority to punish sentenced offenders." *Id.* at 2.

My colleagues in the majority accord little weight to this important point about the understanding expressed by the 114th Congress when it amended § 24-133(b)(2)(F) in 2016 and *re-enacted* CSOSA's duty to develop and operate a program of intermediate sanctions. My colleagues' approach is not saved by the familiar maxim that the views of a later Congress provide no insight into the intent of the Congress (the 105th Congress) that first enacted the language requiring the CSOSA Director to "develop and operate intermediate sanctions programs." That is because the re-enactment, accompanied by Congress's explicit statement about its understanding of the re-enacted statutory term, makes the "views of a later Congress" maxim inapt. The relevant principle here is the following: that "[w]hen a Congress that re-enacts a statute voices its approval of an . . . interpretation thereof,

Congress is treated as having adopted that interpretation, and [courts are] bound thereby." *United States v. Bd. of Comm'rs*, 435 U.S. 110, 134 (1978).[3]

Further, Congress did not legislate in a vacuum when it amended the CSOSA authorizing statute to re-enact the agency's sanctions mandate and to add a mandate to develop and operate an incentives program. In promulgating its final rule entitled "Community Supervision: Administrative Sanctions" in 2003, CSOSA had explained that the "purpose of imposing sanctions is to enable CSOSA staff to respond as swiftly, certainly, and consistently as practicable to non-compliant behavior," 68 Fed. Reg. 19738, 19738 (Apr. 22, 2003), and stated that its sanctions "present the community supervision officer with a range of corrective actions (*see* § 810.3) *which can be applied short of court or USPC approval*." *Id.* (emphasis added). During congressional hearings on District of Columbia appropriations for fiscal year (FY) 2005, Congress had been advised of CSOSA's interpretation that "[o]ffenders who are under parole or supervised release supervision *may be placed*

---

[3] *See also United States v. Freeman*, 44 U.S. 556, 564-565 (1845) ("[I]f it can be gathered from a subsequent statute *in pari materia*, what meaning the legislature attached to the words of a former statute, they will amount to a legislative declaration of its meaning, and will govern the construction of the first statute."); *Orr v. United States*, 343 F.2d 553, 556 (5th Cir. 1965) ("[H]ere[,] the later Congress reenacted the words of the earlier Congress; the legislative history in the later Congress is a gloss on the statute.").

*on GPS monitoring at CSOSA's discretion*" (emphasis added).[4] Congress heard much the same during hearing on District of Columbia appropriations for FY 2006: that CSOSA had "worked with the D.C. Superior Court and the U.S. Parole Commission to define a range of sanctions that the Community Supervision Officer can impose without the delay of seeking judicial or paroling authority approval."[5] In a 2011 congressional hearing on general government appropriations for FY 2012, Congress was again advised that CSOSA had "develop[ed] a range of options that Officers can implement immediately, prior to requesting that offenders be sanctioned by the releasing authority."[6]

---

[4] *District of Columbia Appropriations for Fiscal Year 2005: Hearing on H.R. 4850/S. 2826 Before the S. Subcomm. of the Comm. on Approps.*, 108th Cong. 32 (2004) (answers submitted by Paul A. Quander, Jr., Director, CSOSA) (explaining also that "[o]ffenders who are placed on this type of electronic monitoring generally have violated conditions of their supervision, and the GPS is used when other intermediate sanctions have been exhausted").

[5] *District of Columbia Appropriations for Fiscal Year 2006: Before the S. Subcomm. of the Comm. On Approps.*, 109th Cong. 46 (2005) (answers submitted by Paul A. Quander, Jr., Director, CSOSA).

[6] *Financial Services and General Government Appropriations for 2012: Hearings Before the H. Subcomm. of the Comm. on Approps.*, 112th Cong. 109 (2011) (statement of Adrienne R. Poteat, Deputy Director, CSOSA). In a hearing on general government appropriations for FY 2009, the CSOSA Director advised Congress that "[s]ince fiscal year 2004, CSOSA ha[d] placed over 2,000 high-risk offenders on Global Positioning System (GPS) monitoring to reinforce compliance and track their location[.]" *Financial Services and General Government Appropriations for Fiscal Year 2009: Hearing before the S. Subcomm. of the Comm. on Approps.*, 110th Cong. 416 (2009) (statement by Paul A. Quander, Jr., Director, CSOSA).

And it was not only in appropriations hearings that Congress was apprised of the sanctions CSOSA was employing. The then-CSOSA Director told a congressional oversight committee in 2008 that CSOSA had placed more than 2,000 high-risk offenders on GPS monitoring since FY 2004.[7] The then-Acting Director of CSOSA told the same oversight committee in 2009 that "CSOSA imposes increasingly restrictive penalties on offenders for violating their release conditions" and that the sanctions "can involve . . . GPS monitoring."[8] The Acting Director went on to answer questions about the effectiveness of GPS.[9] These statements from 2009 were made during an oversight hearing in which the subcommittee was specifically focused on "the policies and practices of . . . the Parole Commission or the Court Services and Offender Supervision Agency," the effectiveness of the agencies' carrying out of their criminal justice responsibilities, and "the use of graduated

---

[7] *Advancements and Continual Challenges in the Parole, Supervised Release and Revocation of D.C. Code Offenders: Hearing before the H. Subcomm. on Fed. Workforce, Postal Service, and D.C. of the Comm. on Oversight and Gov't Reform*, 110th Cong. 23, 27 (2008) (statement of Paul A. Quander, Jr., Director, CSOSA).

[8] *The Local Role of the U.S. Parole Commission: Increasing Public Safety, Reducing Recidivism, and Using Alternatives to Re-incarceration in the District of Columbia: Hearing before the H. Subcomm. on Fed. Workforce, Postal Service, and D.C. of the Comm. on Oversight and Gov't Reform*, 111th Cong. 27, 30 (2009) (statement of Adrienne Poteat, Acting Director, CSOSA) ("2009 House Oversight Committee Hearing").

[9] 2009 House Oversight Committee Hearing at 102.

sanctions."[10] Testimony directed the subcommittee's attention to issues such as "the matter of the [Parole] Commission's continued existence."[11]

Tellingly, my colleagues are willing to assume that Congress "was familiar with nondelegation principles operating in the federal courts," *ante* at 23 n.8, but they persist in ignoring the foregoing evidence that Congress had been made well aware, in the specific CSOSA oversight context, of how CSOSA interpreted its intermediate sanctions responsibility before it went on to re-enact the statutory provision imposing that *duty* (not merely *authority*) on CSOSA.[12]

"Where an agency's statutory construction has been fully brought to the attention of the public and the Congress, and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned." *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982) (internal quotation marks omitted). That legal principle applies here with respect to CSOSA's construction of its mandate under D.C. Code § 24-133(b)(2)(F). That and the legislative history of section 24-133(b)(2)(F) show

---

[10] 2009 House Oversight Committee Hearing at 2 (Statement of Subcommittee Chair Stephen F. Lynch).

[11] 2009 House Oversight Committee Hearing at 24 (statement of Parole Commission Chairman Isaac Fulwood).

[12] The re-enactment can effectively be viewed as a ratification by Congress of CSOSA's interpretation of its statutory mandate. *See Young v. Tenn. Valley Auth.*, 606 F.2d 143, 147 (6th Cir. 1979).

that Congress intended to authorize and did authorize CSOSA to operate a program of sanctions (such as the requirement to wear a GPS monitor) for a supervised releasee's failure to comply with conditions of supervised release.

## B. The administrative sanction regulations

Consistent with the foregoing statutory authority, Parole Commission regulations direct releasees supervised by CSOSA to comply with CSOSA-imposed sanctions. Specifically, 28 C.F.R. § 2.204(a)(6)(vi) (2023) states:

> (vi) Comply with a graduated sanction. If you are supervised by CSOSA, you must comply with the sanction(s) imposed by the supervision officer and as established by an approved schedule of graduated sanctions. We may decide to begin revocation proceedings for you even if the supervision officer has earlier imposed a graduated sanction for your alleged violation of a release condition.

Thus, in effect, the Parole Commission has in effect adopted CSOSA's schedule of graduated sanctions as a Parole Commission requirement. CSOSA's own regulations explain that a supervised releasee "will be in violation of the conditions of [their] supervision" and "administrative sanctions" may be imposed "if [their] CSO has reason to believe that [they] are failing to abide by the general or specific conditions of release or [they] are engaging in criminal activity." 28 C.F.R. § 810.3(a) (2023). The CSOSA regulations list "[e]lectronic monitoring for a

specified amount of time" as an administrative sanction "available to the CSO." *Id.* § 810.3(b)(6).

Although my colleagues are willing to "assume for purposes of t[he majority] opinion" that CSOSA may have some authority to "administratively sanction," *ante* at 29 (brackets removed) (emphasis omitted), they conclude that "[CSOSA's] regulations may not reasonably authorize its officers to impose electronic monitoring in the form of GPS tracking on supervised releasees absent [on each occasion, I presume] the express authorization of the Parole Commission." *Ante* at 44.[13] My colleagues do not, however, adequately explain why GPS monitoring should not be regarded as an administrative sanction. To be sure, courts have held in the several federal appellate cases cited in the majority opinion (*ante* at 21-23) and others that

---

[13] I pause here to note that I concur with my colleagues that CSOSA has no authority to impose conditions of supervised release. As this court explained in *Hunt v. United States*, 109 A.3d 620 (D.C. 2014), "the statutory framework here is clear: [the Parole Commission] or the Superior Court imposes conditions on release and CSOSA monitors compliance with those conditions." *Id.* at 623. We recognized that "if releasees 'are failing to abide by the general or specific conditions of release,'" "CSOSA imposes administrative sanctions" that "are an *alternative* to requesting a hearing that 'may result in . . . changes to the conditions of . . . release.'" *Id.* (quoting 28 C.F.R. § 810.3 (a) (2014)). We recognized in *Hunt* that electronic monitoring imposed by CSOSA as a sanction is *not* a condition of release (violation of which could support a criminal charge under D.C. Code § 22-1211(a)(1)). *Id.* But the fact that electronic monitoring can be ordered as a condition of release (a condition the Parole Commission "ordinarily imposes . . . on sex offenders," 2009 House Oversight Committee Hearing at 24) does not mean that GPS monitoring for a specified period of time may not be imposed by CSOSA as an administrative sanction for violating conditions of release.

"any condition [of supervised release] that affects a significant liberty interest . . . must be imposed by the [entity to whose authority a releasee is subject]." *United States v. Matta*, 777 F.3d 116, 123 (2d Cir. 2015) (quoting *United States v. Mike*, 632 F.3d 686, 696 (10th Cir. 2011)). But a common thread in those cases is that they discussed release conditions that substantially restricted an offender's travel and where he or she could be at particular times. *See id.* (citing a requirement that the offender participate in residential treatment); *United States v. Fiume*, 643 F. App'x 25, 28 (2d Cir. 2016) (noting that "[h]ome detention is a [] condition that is significantly more onerous than GPS monitoring" and citing U.S. Sentencing Guideline 5F1.2 specifying that home detention as a condition of probation or supervised release may be imposed "only as a substitute for imprisonment"); *United States v. Esparza*, 552 F.3d 1088, 1091 (9th Cir. 2009) (explaining that a probation officer may not make the decision to order inpatient treatment); *United States v. Heath*, 419 F.3d 1312, 1315 (11th Cir. 2005) (impermissible to delegate to the probation officer the decision whether the offender had to participate in a mental health program); *United States v. Kent*, 209 F.3d 1073, 1078-1079 (8th Cir. 2000) (improper delegation to probation officer to determine whether the defendant would undergo counseling).

As to GPS monitoring as a condition of release, courts have recognized that when it is required for the *entire* supervision period and applies without exception,

without any determination particular to the offender, it "imposes a significant limitation on liberty." *Commonwealth v. Cory*, 911 N.E.2d 187, 195 (Mass. 2009). But the rationales of these cases do not explain why relatively short-term GPS monitoring—such as the 90-day period of monitoring for which appellant's CSO referred him, imposed only as a sanction for his violation of conditions of release set by the Parole Commission—is so significant a limitation on liberty that it may not be imposed as an administrative sanction. There can be no doubt that GPS monitoring "is intrusive," i.e., "a serious intrusion on personal privacy," *United States v. Jackson*, 214 A.3d 464, 476-77 (D.C. 2019), and that it constitutes a restriction on a releasee's liberty. But, as we observed in *Jackson*, GPS tracking data is reviewed by CSOSA "solely to determine whether supervisees were present at crime scenes or prohibited locations, or were violating curfews," a limited use that makes CSOSA's GPS monitoring "far less of an intrusion on a supervisee's privacy than, for example, the warrantless search of a private home sanctioned in *Griffin*." *Id.* at 478. There are other (seemingly non-controversial) conditions of release for all releasees that impose more restrictions on the releasee's movements, travel, and freedom of association (such as the requirement to "report to the supervision officer as that officer directs," 28 C.F.R. § 2.204(a)(4)(i) (2023), and the prohibitions against "leav[ing] the district of supervision without the written permission of [the] supervision officer," *id.* § 2.204(a)(5)(iv), and "associat[ing] with a person who has

a criminal record without the permission of [the] supervision officer," *id.* § 2.204(a)(5)(v)) than GPS monitoring does. By comparison, GPS monitoring, though it "somewhat curtails" a releasee's activities and freedom of movement, *Jackson*, 214 A.3d at 477, appears to fit quite comfortably within the rubric of an "intermediate" sanction when imposed on a temporary basis and only as a sanction for non-compliance with a condition(s) of release. We need not decide whether all of CSOSA's regulations are valid or describe sanctions than can be imposed by CSOSA without rising to the level of a special condition of release to conclude that temporary GPS monitoring as a sanction for non-compliance does not exceed CSOSA's statutory authority.[14]

## C. The majority's interpretation of D.C. Code § 24-133(b)(2)(F).

I now turn to a textual analysis of why I believe the opinion for the court is wrong about the meaning of the pertinent statutory language. My colleagues in the majority suggest, *ante* at 26-27, that CSOSA's statutory responsibility to "[d]evelop and operate intermediate sanctions . . . programs," D.C. Code § 24-133(b)(2)(F), means only that CSOSA is to make sentencing options that Superior Court trial

---

[14] I note that while CSOSA's regulations list "[p]lacement in a residential sanctions facility . . . for a specified period of time," 28 C.F.R. § 810.3(b)(8), as an administrative sanction "available to the CSO," USPC regulations treat the requirement to reside in a community corrections center and the requirement to remain at home during hours when the releasee is not working or going to school as "special conditions of release." *Id.* § 2.204(b)(2)(i), (iii).

judges might impose, just as the Truth in Sentencing Commission, through a separate provision of the Revitalization Act, was charged with making "recommendations [to the Superior Court] for determining the sentence to be imposed," including "[w]hether to impose . . . intermediate sanctions in appropriate cases."[15] *Ante* at 26 (emphasis omitted) (quoting Balanced Budget Act, § 11212(f)(1) (codified as D.C. Code § 24-112(f)(1)). But the fact that the CSOSA Director is required to operate a program of intermediate sanctions for "sentenced offenders" indicates that the CSOSA task, which comes *after* the Superior Court has imposed a sentence, differs from the Sentencing Commission task (which, again, entails making recommendations as to "the sentence to be imposed"). Moreover, D.C. Code § 24-

---

[15] As support for their reasoning that the term "intermediate sanctions" must have the same meaning in both places where it was used in the Act, my colleagues cite *Edwards v. United States*, 583 A.2d 661, 664 (D.C. 1990) (acknowledging the "presumption that identical words used in the same or related legislation were intended to have the same meaning"). But the presumption described in *Edwards* is not inflexible. *See Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433-34 (1932) (explaining that "the presumption is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent"; observing that "[i]t is not unusual for the same word to be used with different meanings in the same act, and there is no rule of statutory construction which precludes the courts from giving to the word the meaning which the legislature intended it should have in each instance"). While the Truth in Sentencing Commission and CSOSA provisions of the Balanced Budget Act both refer to "intermediate sanctions," so do Medicaid and Medicare+Choice provisions of the same omnibus legislation. *See, e.g.*, § 1852(k)(2)(A)(iii), 111 Stat. 275, 298; § 1857(g)(3), 11 Stat. 275, 324; § 4707(e)(1), 111 Stat. 489, 503. The meaning clearly is not the same in all those places.

133(b)(2)(F) mandates that CSOSA develop and operate both sanctions programs and incentives programs. The latter cannot reasonably be read as entailing making recommendations to the court that a releasee who has been compliant with his conditions of release should be given bus fare to a job interview or money for a GED test. To the contrary, providing such incentives is most reasonably understood as a matter for day-to-day CSO decision-making to be accomplished with the immediacy needed to respond to circumstances, not as a duty to recommend an incentive award to another decision-maker whose availability and ability to respond promptly is (at least) a tier removed. As this court observed in *Jackson*, "unanticipated circumstances may arise and justify CSOSA's employment of [GPS monitoring] as an intermediate and hopefully temporary sanction." 214 A.3d at 480. And as CSOSA has explained, "[a] critical factor in [] supervision [of releasees] is the ability to introduce an accountability structure into the supervision process and to provide swift, certain, and consistent responses to non-compliant behavior" and to avoid the uncertain response time that may ensue after reporting a violation to the releasing authority. Community Supervision: Administrative Sanctions Schedule, 66 Fed. Reg. 48336, 48336 (Sept. 20, 2001). The statutory language coupling the CSOSA Director's authority to develop and operate sanctions and incentives programs therefore is most reasonably understood as authority to effectuate both sanctions and

incentives at the CSOSA level, not merely to recommend them to the court (or the Parole Commission).

Contrary to my colleagues' suggestion, this interpretation does not amount to an unlawful delegation by the Parole Commission of statutory responsibility with respect to D.C. offenders on supervised release. To be sure, as discussed above, the Parole Commission has directed in its regulations that CSOSA supervisees must "comply with the sanction(s) imposed by the supervision officer and as established by an approved schedule of graduated sanctions." 28 C.F.R. § 2.204(a)(6)(vi) (2023). But both USPC regulations and CSOSA regulations acknowledge that CSOSA's sanctions decisions remain subject to the Commission's override or modification. Thus, recognizing CSOSA's authority to impose GPS monitoring for a specified period of time pursuant to its administrative sanctions authority does not, as my colleagues suggest, "transgress on the Parole Commission's adjudicatory role." *Ante*, at 31.[16] Section § 2.204(a)(6)(vi) specifically announces USPC's reservation of authority to "decide to begin revocation proceedings for [a releasee] even if the [CSOSA] supervision officer has earlier imposed a graduated sanction

---

[16] Regarding procedures that do constitute adjudications, both CSOSA and the Parole Commission described to the House oversight committee in 2009 that they had created "an alternative sanction option called the Reprimand Sanction Hearing," a "last step" before a revocation hearing, which is conducted by a Parole Commission member with CSOSA staff present and a representative of the Public Defender Service present. 2009 House Oversight Committee Hearing at 21, 31-32.

for [the releasee's] alleged violation of a release condition."[17]  Similarly, CSOSA's regulations specify that releasees "remain subject to further action by the releasing authority" and states as an example that "the USPC may override the imposition of any of the sanctions in paragraph (b) of this section[.]"[18]  *Id.* § 810.3(c).  USPC's regulations also provide that CSOs must submit reports and information concerning the enforcement of a releasee's conditions of supervised release "as the [Parole Commission] may direct." *Id.* § 2.207.  Thus, USPC retains oversight of any decision by a CSOSA CSO to refer a release for GPS monitoring for a specified period of time.

### D. The majority's interpretation of D.C. Code § 24-133(d).

Like appellant's brief on appeal, the majority opinion highlights D.C. Code § 24-133(d), which states that CSOSA officers "shall have and exercise the same powers and authority as are granted by law to United States Probation and Pretrial Officers."  Reading section 24-133(d) as language of limitation, my colleagues

---

[17] In addition, the Parole Commission has reserved the right to "change or add to the conditions of release," 28 C.F.R. § 2.204(c)(1) (2023), and it has set limits on a CSO's authority to approve a releasee's travel outside the D.C. metropolitan area, *id.* § 2.206(a).

[18] *Cf. United States v. Johnson*, 48 F.3d 806, 809 (4th Cir. 1995) ("[I]n every delegation, the court must retain the right to review findings and to exercise ultimate authority[.]").

emphasize that federal probation and pretrial officers "are assigned only administrative and supervisory duties" and have "decisionmaking authority over certain *minor* details of supervised release." *Ante* at 24 (emphasis added). However, section 24-133(d) should not be read as denoting that CSOSA CSOs shall have *only* "the same powers and authority as are granted by law to United States Probation and Pretrial Officers."[19] That is because section 24-133(d), must be harmonized with the mandate of section 24-133(b)(2)(F) that the CSOSA Director develop and operate an intermediate sanctions program.[20] To read section 24-133(d) as nullifying section

---

[19] I also note that per CSOSA's Policy Statement 4008 on Global Positioning System (GPS) Tracking of Offenders, *Supervisory* CSOs "are responsible for reviewing CSO requests for GPS placement and then referring eligible offenders for GPS tracking"; while CSOs are responsible for identifying offenders to be placed on GPS monitoring, they must "get concurrence" from a Supervisory CSO. CSOSA, Policy Statement 4008: Global Positioning System (GPS) Tracking of Offenders 2, 7 (2009), https://bit.ly/31nq4vN; https://perma.cc/2DWK-CPQB. This appears to be another reason why the limited power and authority of United States Probations Officers does not foreclose Supervisory CSO decisions to impose GPS monitoring as a sanction.

[20] The Director's "authority to delegate discretionary and quasi-judicial powers to agency subordinates [such as CSOs] is implied where the powers bestowed upon an agency head are impossible of personal execution." *Martin v. Neb. Dep't of Corr. Servs.*, 671 N.W.2d 613, 619 (Neb. 2003) (internal quotation marks omitted) (rejecting the argument that the Director of the Department of Correctional Services could not delegate his authority to approve inmates' forfeiture of good time credits). In any event, appellant has not questioned the authority of his CSO to make the sanctions decision upon delegation by the CSOSA Director, and the record provides no basis for concluding that the CSO acted without a delegation of authority from the CSOSA Director in referring appellant for GPS monitoring.

24-133(b)(2)(F) is not a reasonable interpretation that harmonizes the overall statutory scheme.[21] The Supreme Court and this court have not hesitated to harmonize seemingly conflicting statutory provisions by restricting the reach of some of the relevant language. *See, e.g.*, *Citizens Bank v. Strumpf*, 516 U.S. 16, 20-21 (1995); *J.P. v. District of Columbia*, 189 A.3d 212, 222 (D.C. 2018). In *Citizens Bank*, the Supreme Court narrowly interpreted the scope of 11 U.S.C. § 362(a)(7) (the Bankruptcy Code automatic stay provision) in order to preserve the right of a creditor to offset a debt provided for in a separate section of the Bankruptcy Code. 516 U.S. at 17. The Court reasoned that "[i]t would be an odd construction of § 362(a)(7) that required a creditor with a right of setoff to do immediately that which § 542(b) specifically excuses it from doing[.]" *Id.* at 20. In *J.P.*, this court upheld the inpatient commitment of juvenile J.P. pursuant to D.C. Code § 24-531.07(a)(2) notwithstanding the language of D.C. Code § 7-1231.14 that specifies, subject to a few exceptions that did not apply in J.P.'s case, that "no minor may be admitted for inpatient mental health services absent the consent of a parent or legal guardian." D.C. Code § 7-1231.14(a); *see J.P.*, 189 A.3d at 218. We reasoned, inter alia, that "§ 7-1231.14(a)'s parental-consent requirement does not appear to have been directed at criminal proceedings." *J.P.*, 189 A.3d at 218.

---

[21] *See In re T.L.J.*, 413 A.2d 154, 158 (D.C. 1980) (noting the "well-accepted tenet of statutory construction that, whenever possible, a statute should be interpreted as a harmonious whole" (internal quotation marks omitted)).

Similarly here, it would be an odd construction of D.C. Code § 24-133(d) to read the section as canceling out the role of CSOSA CSOs in carrying out the agency's duty to operate a program of intermediate sanctions, when section 24-133(b)(2)(F) imposes on the CSOSA Director the specific *duty* to develop and operate such a program (and it is fairly implied that the Director may do so through CSOSA staff). Nothing in the text of the statute or its legislative history suggests that section 24-133(d) was directed at limiting CSOs' role with respect to the operation of a program of intermediate sanctions, a duty Congress specifically imposed on CSOSA in the same legislation in which it provided that CSOs would have the powers and authority of federal probation officers. Further, under the general principle of statutory construction that "if two provisions conflict, . . . the later supersedes the earlier,"[22] even if that limiting interpretation of section 24-133(d) were otherwise reasonable, the fact that the sanctions language of section 24-133(b)(2)(F) was re-enacted in 2016, a date *later* than the 1997 enactment of section 24-133(d), dictates that the duty section 24-133(b)(2)(F) imposed on the CSOSA Director superseded any limit on the powers of CSOs that section 24-133(d) could otherwise be read to impose.

---

[22] *Bridgforth v. Gateway Georgetown Condo., Inc.*, 214 A.3d 971, 975 (D.C. 2019).

I note in addition that with respect to other language in the D.C. Code similar to the "shall have and exercise the same powers and authority as" clause of D.C. Code § 24-133(d), a limiting interpretation such as appellant urges and my colleagues have adopted plainly would *not* be correct. D.C. Code § 5-201 provides that the United States Park Police "shall have and perform the same powers and duties as the Metropolitan Police of the District." We have interpreted this language to mean that the Park Police, like the MPD, have jurisdiction to make arrests "throughout the District of Columbia," *Richardson v. United States*, 520 A.2d 692, 694 (D.C. 1987) (Park Police arrest authority extends beyond federal parks and enclaves). But it would be incorrect to read section 5-201 as limiting the authority of the Park Police to locations in the District of Columbia, because under D.C. Code § 5-206, Park Police officers "shall have the power and authority to make arrests" "[o]n and within roads, parks, parkways, and other federal reservations in the *environs of* the District of Columbia" (emphasis added). The term "environs of the District of Columbia" is "defined as embracing Arlington, Fairfax, Loudoun, Prince William, and Stafford Counties and the City of Alexandria in Virginia, and Prince George's, Charles, Anne Arundel, and Montgomery Counties in Maryland." D.C. Code § 5-208.[23] Thus, the reference in section 5-201 to the Park Police having the

---

[23] By contrast, as we recognized in *District of Columbia v. Coleman*, 667 A.2d 811, 818 n.11 (D.C. 1995), an MPD officer would have "had no police powers at the time of [an] incident" in Maryland.

"same powers and duties" as the MPD is not properly read as limiting the power and duties of Park Police officers. Here likewise, the language conferring on CSOSA CSOs the same power and duties as U.S. Probation officers should not be read to exclude from CSOs' authority a broader scope of authority that is specific to them as the staff of the CSOSA Director, who is *mandated* by D.C. Code § 24-133(b)(2)(F) to operate a program of intermediate sanctions.

### E. The fact that GPS monitoring is a search.

The additional rationale on which the majority opinion rests its conclusion is that CSOSA's electronic monitoring regulation is ultra vires is that (1) as this court recognized in *Jackson*, GPS monitoring is a search and (2) Parole Commission policy is that probation/supervision officers have no authority to order warrantless searches of releasees. *Ante* at 37-38.

Our opinion in *Jackson* acknowledged that "when the government 'attaches a device to a person's body, without consent, for the purpose of tracking that individual's movements,' it conducts a search" for purposes of the Fourth Amendment protection against unreasonable searches and seizures. 214 A.3d at 472 (quoting *Grady v. North Carolina*, 575 U.S. 306, 309 (2015)). We explained that "[w]e determine whether a search is reasonable by assessing, on the one hand, the degree to which it intrudes upon an individual's reasonable expectation of privacy

and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* (brackets and internal quotation marks omitted).

We held in *Jackson* that GPS monitoring on Mr. Jackson, a probationer, without judicial authorization was justified as a reasonable intrusion on Mr. Jackson's privacy to meet "special needs," *id.* at 471, and was constitutional because "his reasonable expectation of privacy as a convicted offender on probation was diminished and was outweighed by the strong governmental interests in effective probation supervision to deter and detect further criminal activity on his part and encourage his rehabilitation." *Id.* at 467. We referred to CSOSA's regulations as "the counterpart to the regulation at issue in *Griffin* [*v. Wisconsin*, 483 U.S. 868 (1987)]." *Id.* at 475. And in *Atchison v. United States*, 257 A.3d 524 (D.C. 2021), finding no meaningful distinction between probation and supervised release, we held that the reasoning of *Jackson* governs in supervised release cases as well. *Id.* at 531.

This court's recognition that a releasee under supervision "must expect considerable supervisory intrusion on his privacy," *Jackson*, 214 A.3d at 478, undermines my colleagues' conclusion that temporary GPS monitoring as a sanction could not lawfully be imposed on appellant as an administrative sanction. "Like the Supreme Court [reasoned] in *Griffin*," and like this court observed in *Jackson*, "little if anything would be gained in most cases by setting up [the Parole Commission]

rather than the [community supervision] officer as the judge of how close a supervision the [releasee] requires from time to time." *Id.* at 480 (internal quotation marks omitted). Further, after the carjacking to which appellant pled guilty, "[i]t cannot plausibly be maintained that the intrusion of GPS tracking was disproportionate to the threat [appellant] posed to the safety of the community." *Id.* at 479.

What is left of my colleagues' search rationale for overturning CSOSA's authority to impose GPS monitoring is their reliance on a pre-*Grady* Parole Commission Rules & Procedures Manual that states in its section 2.204-18(a) that "[s]earches by Supervision Officers are disfavored." *Ante* at 33-35. Nothing in the record tells us whether this June 30, 2010, document, accessible on the internet but not cited by the trial court, was the USPC policy at the time appellant's GPS device was put on, whether it reflects USPC policy in the wake of the Supreme Court's 2015 opinion in *Grady*, or whether USPC has reconsidered its policy or modified its guidance in recognition that GPS monitoring constitutes a search.[24] What can be said is that the further discussion of the issue in the same section of the Rules &

---

[24] It is clear that at least prior to *Grady*, the Parole Commission generally allowed CSOSA "to decide on the appropriate methods and technologies employed to monitor a releasee's compliance with release conditions," including whether to conduct monitoring through electronic tracking devices such as GPS tracking devices. Paroling, Recommitting, and Supervising Federal Prisoners: Prisoners Serving Sentencing Under the United States and District of Columbia Codes, 68 Fed. Reg. 41696, 41699 (July 15, 2003).

Procedures Manual seems to include within its scope only searches that present issues such as whether CSOs are "authorized to restrain third parties during a search" (according to the 2010 Manual, they are not), whether "it is reasonably foreseeable that a third party or the releasee himself may present a danger," what should be done with seized items, and whether the contemplated scope of the search will result in other than minor damage to the property to be searched. *Id.* § 2.204-18(b)(3). It is also noteworthy that the Rules & Procedures Manual lists "curfew with electronic monitoring" as one of the graduated sanctions that CSOSA may impose, without any indication that electronic monitoring is subject to the search policy described in section 2.204-18(a). *Id.* § 2.204-21. Accordingly, the record does not support a conclusion that CSOSA's imposition of temporary GPS monitoring as a sanction for non-compliance is contrary to the search policy of the Parole Commission.

**F. Appellant's arguments are properly subject to plain-error review.**

The foregoing point, about an argument not developed in the trial court, brings me to my final argument in dissent, which is that, for the most part, appellant's arguments in this appeal should be subject to review only for plain error. That is because, before the Superior Court, appellant never argued that CSOSA's imposition of GPS monitoring was statutorily invalid because it falls outside the scope of CSOSA's duty described in D.C. Code § 24-133(b)(2)(F) (the mandate to "develop and operate intermediate sanctions programs") and is contrary to section 24-133(d)

(stating that CSOs shall have the power and authority of United States probation officers).

In his opening brief in support of his motion to suppress, appellant argued that CSOSA's requiring him to wear a GPS device without approval of a judicial officer was a Fourth Amendment violation. At the suppression hearing, the trial court (the Honorable Ronna Beck) sua sponte requested supplemental briefing from the parties on "the authority of CSOSA to require GPS monitoring." Judge Beck explained that she was aware that "the Parole Commission has the authority under [the D.C.] Code to exercise the authority of the [c]ourt" over supervised releasees and that CSOs have "the same authority as probation officers and pretrial release officers under the U.S. Code." Understanding that "CSOSA is the one here that [] imposed the GPS monitoring," Judge Beck requested additional briefing on whether CSOSA's power to impose GPS tracking is "authority given by statute, whether it's authority given by the Parole Commission, or whether it's inherent authority." The court asked whether CSOSA "can [] just do that?" The court's "focus" was "what entitles CSOSA to impose the GPS monitoring condition?"

In its supplemental brief, the government told the court that CSOSA had "the legal authority to place [appellant] on GPS monitoring" and was authorized "to impose it as an 'intermediate sanction' to 'encourage compliance with release conditions.'" As support, the government cited D.C. Code § 24-133(b)(2)(F) and

CSOSA's regulations regarding administrative sanctions (28 C.F.R. § 810.3 (2014)), as well as this court's decision in *Hunt*. The court's pointed questions and the government's arguments in its supplemental brief should have prompted appellant to raise in his supplemental brief the arguments he now raises: that 28 C.F.R. § 810.3(b) is invalid as exceeding CSOSA's statutory authority under § 24-133(b)(2)(F) because that provision merely requires CSOSA to develop sentencing recommendations and implement sentencing orders; and that D.C. Code § 24-133(d) *limits* the power and authority of CSOSA supervision officers "to the degree warranted by the conditions specified by the sentencing court," 18 U.S.C. § 3601, or set by the Parole Commission as appellant's particular conditions of release. *These were precisely the types of arguments the court's request for supplemental briefing invited. But appellant did not present them in his response to the court's questions or to the government's submission.* We should hold that appellant forfeited these arguments by his failure to raise them in the trial court.

This court's opinion in *Nesbeth v. United States*, 870 A.2d 1193 (D.C. 2005), is instructive. Defendant Nesbeth, who had been convicted of marijuana possession, argued on appeal that his conviction violated the Religious Freedom Restoration Act ("RFRA"). *See id.* at 1194. We reviewed the claim only for plain error, agreeing with the government that Nesbeth had never adequately presented the statutory claim to the trial judge. *Id.* at 1196. We noted that in the trial court, Nesbeth had argued

that his use of marijuana "was essential to the free exercise of his religion, his right under the First Amendment." *Id.* (internal brackets and quotation marks omitted). Particularly analogous to the situation in the instant case, "[w]hen the judge asked him for case law from this jurisdiction or the Supreme Court supporting the religious defense, he again asserted 'the First Amendment.'" *Id.* Then, "[a]s the trial progressed, the judge twice informed him of binding decisional law rejecting his constitutional free exercise claim." *Id.* Still, Nesbeth "never once mentioned the RFRA to the trial judge." *Id.* We noted that "[o]n neither occasion did [Nesbeth] attempt to clarify that instead he was making a statutory argument[.]" *Id.* Citing our regularly applied rule that "'[p]oints not asserted with sufficient precision to indicate distinctly the party's thesis will normally be spurned on appeal,'" *id.* at 1197 (quoting *Baxter v. United States*, 640 A.2d 714, 717 (D.C. 1994), we said that Nesbeth's "bare citation to a decision [] involving an RFRA defense, while he asserted explicitly only a claim grounded in the First Amendment and never attempted to tell the judge the difference, did not raise the statutory claim with the distinctness necessary to preserve it." *Id.*

Here similarly, Judge Beck's specific request to the parties to address whether CSOSA's power to impose GPS tracking was "authority given by statute," followed by appellant's failure to address with specificity the statutory provisions (sections 24-133(b)(2)(F) and (d)) or his interpretations thereof that he now argues

answer the question, should result in review of these arguments only for plain error. It was not enough for appellant to assert that CSOSA's regulation was "statutorily . . . impermissible" to the extent it allowed CSOSA to add new conditions of release. The trial court was not "demonstrably . . . aware of the potential [statutory-construction] error" appellant now argues, *Graves v. United States*, 245 A.3d 963, 969 (D.C. 2021), and nothing in the "record confirms that the judge was well aware of the legal issue[s]" appellant has advanced on appeal, such that it is "perfectly fair to view the judge as being on notice" of the arguments. *Tinsley v. United States*, 868 A.2d 867, 883 (D.C. 2005 (Glickman, J., dissenting) (noting that the trial judge had "acknowledged that 'extreme circumstances' had to exist to justify any exclusion" of the public from the courtroom). This also is not a case where "the trial judge specifically articulated the essential legal principle," *Tindle v. United States*, 778 A.2d 1077, 1082 (D.C. 2001); or where the trial court's comments gave appellant "every reason to think [that the arguments he now has raised for the first time on appeal] would be pointless," *Graves*, 245 A.3d at 970; or in which the new arguments presented on appeal have been "generated by a change in the law, and were not available" to appellant during the trial court proceedings, *Stancil v. United States*, 866 A.2d 799, 805 (D.C. 2005).[25] Appellant's new

---

[25] The majority opinion seems to reason that because in the trial court the government did not rely on the special-needs-search doctrine as a justification for

arguments were "not even obscurely hinted at" in his supplemental briefing, and the Superior Court judge "quite excusably failed to grasp [them]." *United States v. Franks*, 463 F. App'x 895, 896 n.1 (11th Cir. 2012) (internal quotation marks omitted).[26] This case therefore calls for plain-error review of appellant's claim that

---

CSOSA's GPS monitoring but now embraces that rationale, appellant, too, should be permitted to rely without limitation on the new interpretations of sections 24-133(b)(2)(F) and 24-133(d) he now advances. *Ante* at 6-7, 15-18. But the situations are not analogous. Prior to this court's opinions in *Jackson* and *Atchison,* the government acknowledged that "CSOSA's placement of the defendant on GPS monitoring was not a 'special needs' search 'for a purpose other than law enforcement.'" This court subsequently held in *Jackson*, however, that CSOSA's imposition of GPS monitoring on a probationer "was a constitutional 'special needs' search," 214 A.3d at 467, and then in *Atchison* extended that holding to supervised release, 257 A.3d at 530, notwithstanding that law enforcement was one purpose of the monitoring. By contrast, there has been no clarification of the law such that appellant should now be permitted to make arguments that were available to him all along, but that he forfeited when the trial court specifically asked for briefing on whether—and why or why not—CSOSA had authority to impose GPS monitoring.

[26] And, as in *Tinsley*, "there is a potentially significant gap in the record"— here, regarding what USPC policy was regarding temporary GPS monitoring as a CSOSA-imposed sanction at the time the GPS device was placed on appellant, "a consequence, perhaps, of the fact that no one focused on the question" during the Superior Court proceedings. *Tinsley*, 868 A.2d at 884 (concluding that "immediate reversal of Tinsley's convictions would be premature because the government should be given an opportunity to prove, if it could, that the spectators ejected from Tinsley's trial actually were allowed to return). Here similarly, if USPC's policy about searches by probation officers is dispositive of whether CSOSA's unilateral imposition of GPS monitoring as a sanction for non-compliance with a releasee's conditions of release is lawful, a remand for the government to prove what that USPC policy is would seem to be required.

he is entitled to reversal of his conviction on the statutory-interpretation grounds he now urges.

Appellant cannot show plain error as to his argument that CSOSA GPS monitoring of appellant as a sanction for violating his conditions of release exceeded CSOSA's statutory authority under D.C. Code § 24-133(b)(2)(F). As discussed above, the 114th Congress read section 24-133(b)(2)(F) as enacted by the 105th Congress through the Balanced Budget Act of 1997 as granting CSOSA "specific statutory authority to punish sentenced offenders." S. Rep. No. 114-110, at 2 (2015). This "expressed understanding . . . is surely evidence that it is fairly possible to read the provision that way" (internal quotation marks omitted), *Almendarez-Torres v. United States*, 523 U.S. 224, 270 (1998) (Scalia, J., dissenting)—meaning that it is far from obvious that appellant's interpretation (that section 24-133(b)(2)(F) merely requires CSOSA to develop sentencing options for courts and implement court orders) is correct. For the reasons discussed above, it is also far from obvious that appellant's interpretation of D.C. Code § 24-133(d)—that CSOSA CSOs have only the authority of U.S. probation officers—is correct. Thus, even if *arguendo* all of the points I have discussed above do not *clearly* establish that CSOSA may lawfully impose temporary GPS monitoring as a sanction for non-compliance with a supervised releasee's conditions of release, the Superior Court did not plainly err in denying appellant's motion to suppress.

For all the foregoing reasons, I respectfully dissent from the judgment reversing the Superior Court's denial of appellant's motion to suppress.